**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. —————23-cv-834-DDD-NRN

AMY WARDLAW,

      Plaintiff,

      v.

WESTERN COLORADO REGIONAL DISPATCH CENTER, a governmental entity;
TOWN OF OLATHE, a municipality;
DAVID PEARSON;
ROGELIO PACHECO; and
GEORGETTE BLACK;

      Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

      Plaintiff Amy Wardlaw, by and through counsel Azra Taslimi and Felipe Bohnet-Gomez of RATHOD ǀ MOHAMEDBHAI LLC, respectfully alleges for her Complaint and Jury Demand as follows:

**NATURE OF THE ACTION**

      In April 2021, Amy Wardlaw, a WestCO dispatcher, was sexually assaulted at her place of employment by Olathe Police Officer David Pearson, who abused his position of authority while on duty. Officer Pearson has since pled guilty to two counts of unlawful sexual contact and two counts of harassment in connection with his sexual assault of Ms. Wardlaw, and his conduct with respect to other victims.

      Not surprisingly, Ms. Wardlaw was not Officer Pearson's first sexual assault victim. For years, Officer Pearson used his position as an Officer to proposition, sexually harass,

assault, and intimidate female co-workers, dispatchers, and women in the Town of Olathe.

Although Defendants were aware of Officer Pearson's unlawful behavior, many of them having witnessed the misconduct, all turned a blind eye, allowing Officer Pearson to continue his campaign of sexual harassment. Instead of serving and protecting his community, Officer Pearson used the authority of his office to facilitate his sexual predation. As such, the Olathe Police Department's failure to train, supervise, and discipline Officer Pearson, and WestCO's failure to prohibit him from having access to WestCO dispatchers, led to a violation of Ms. Wardlaw's constitutional rights.

After Ms. Wardlaw had the courage to report to law enforcement that she had been sexually assaulted by Officer Pearson, law enforcement investigators began questioning WestCO's failure to address the situation. As such, WestCO perceived Ms. Wardlaw as having caused an intrusion into its employment practices and thereafter orchestrated a retaliatory campaign against Ms. Wardlaw. Ultimately, WestCO's retaliation led to Ms. Wardlaw's termination on the pretextual grounds that she engaged in "bullying" and "violat[ing] the rules of ethics."

## II. <u>JURISDICTION AND VENUE</u>

1.      Jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1343. This action is authorized and instituted pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 2000e, *et seq.*

2.      Jurisdiction over Plaintiff's pendent state law claims is proper under 28 U.S.C. § 1367(a) because they are so related to Plaintiff's claims arising under federal law that they form part of the same case or controversy.

3.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). Specifically, venue is proper under 28 U.S.C. § 1391(b)(1) because all of the events and omissions alleged herein occurred within the State of Colorado. Venue is also proper under 28 U.S.C. § 1391(b)(2) because at the time of the events and omissions giving rise to this litigation, all of the Defendants resided in this district.

### III.  PARTIES

4.      Plaintiff Amy Wardlaw worked at the Western Colorado Regional Dispatch Center ("WestCO") as a dispatcher until June 11, 2021.

5.      Defendant Town of Olathe ("Olathe") is a Colorado municipality organized under Colorado law and is a "person" subject to suit under 42 U.S.C. § 1983. The Olathe Police Department ("OPD") is the law enforcement department for the Town of Olathe. Olathe employed Defendant David Pearson within the meaning of C.R.S. § 13-21-131.

6.      Defendant WestCO is a governmental entity located in Montrose, Colorado.

7.      WestCO was formed by an intergovernmental agreement on September 21, 2015, and provides municipalities in the region with dispatch and emergency communication for law enforcement, fire protection, and emergency medical services.

8.      Defendant WestCO employed Plaintiff within the meaning of Title VII.

9.      WestCO's board of directors serve as the governing body of WestCO and consist of members selected by the Governing Board, Council, or Entity.

10.     Olathe has a designated seat on WestCO's board of directors.

~~10.~~11. At all relevant times, Olathe Chief of Police Rogelio Pacheco was a member of the WestCO Board.

~~11.~~12. The WestCO Board appointed Mandy Stollsteimer as its Executive Director and to be responsible for the overall management and operation of WestCO.

13.     ~~Olathe~~OPD is ~~onea "member" agency~~ of ~~the constituent law enforcement~~WestCO.

~~12.~~14. All of WestCO's records are jointly owned and controlled by its member agencies ~~served by WestCO~~.

~~13.~~15. Defendant David Pearson was a police officer employed by OPD and Olathe. At all relevant times Defendant Pearson acted under color of state law in his capacity as an officer with OPD.

~~14.~~16. Defendant Rogelio Pacheco was the elected Police Chief of Town of Olathe, a final policymaker for the Town of Olathe regarding law enforcement matters, and an agent of the Town of Olathe. At all relevant times, Chief Pacheco acted under color of state law in his capacity as the Chief of the Olathe Police Department.

~~15.~~17. Sergeant Georgette Black worked as the Sergeant at the Olathe Police Department until July 2022. At all relevant times, Sergeant Black acted under color of state law in her capacity as the Sergeant of the Town of Olathe.

**IV. ADMINISTRATIVE EXHAUSTION**

~~16.~~18. Ms. Wardlaw filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 28, 2022.

17. 19. The Charge of Discrimination included allegations of sex and disability discrimination and retaliation.

18. 20. Ms. Wardlaw requested a Notice of Right to Sue from the EEOC on or about April 3, 2023.

19. 21. Ms. Wardlaw is entitled to a Notice of Right to Sue because more than 180 days have elapsed since she filed her charge of discrimination with the EEOC.

## V. FACTUAL ALLEGATIONS

### Ms. Wardlaw's employment with WestCO

20. 22. Ms. Wardlaw began her employment with WestCO on November 7, 2016, as a dispatcher.

21. 23. In December of 2019, approximately three years after her employment with WestCO began, Ms. Wardlaw was promoted to Public Safety Telecommunicator Supervisor. Ms. Wardlaw was promoted due to her prior skillful performance as a dispatcher and her knowledge and understanding of WestCO's protocols, policies, and procedures.

### Sexual Harassment at WestCO

22. 24. David Pearson was employed as a police officer by the OPD and the Town of Olathe.

23. 25. He had sexually harassed Ms. Wardlaw on multiple occasions.

24. 26. One such occasion occurred in the presence of Georgette Black, who at the time was working as a full-time dispatcher at WestCO and part-time for the Olathe Police Sergeant and Officer Pearson's supervisor. Department as an officer.

5

25. 27. Officer Pearson grabbed Ms. Wardlaw's knee and slid his hand up her leg while talking to Sergeant Officer Black, who witnessed the incident.

26. 28. When Officer Pearson walked away, Ms. Wardlaw complained to Sergeant Officer Black that Officer Pearson often engaged in such behavior and that she "hated it."

27. 29. Sergeant Officer Black told Ms. Wardlaw that Officer Pearson's behavior was not appropriate and that she would put a stop to it.

30.    Nonetheless Within a few months after the incident, Officer Black was promoted to Sergeant at OPD and became Officer Pearson's supervisor.

31.    Whenever Sergeant Black would visit WestCO, Ms. Wardlaw complained about Officer Pearson's inappropriate behavior and his continuous visits to WestCO.

28. 32. Despite Sergeant Black's assurances that she would address the issue, Officer Pearson continued to sexually harass Ms. Wardlaw.

29. 33. In November of 2020, while Officer Pearson leaned over Ms. Wardlaw's desk to look at her computer screen, he deliberately brushed his hand against her breast.

30. 34. The Mayor of Olathe, Roland Huston, also worked as a dispatcher at WestCO, witnessed Ms. Wardlaw's facial expression after this incident, and asked what had happened.

31. 35. Ms. Wardlaw told Mayor Huston that Officer Pearson had deliberately touched her breast.

32.36. In addition to these incidents, Officer Pearson would routinely seek Ms. Wardlaw out and touch her without consent, including by grabbing her knee, rubbing her shoulders, poking her side, or running his hand up her leg.

33.37. On the night of April 4, 2021, Officer Pearson was even more brazen with Ms. Wardlaw.

34.38. Officer Pearson entered the WestCO Dispatch Unit at 2:00 a.m. with his trainee, James Fogg, while Ms. Wardlaw was working as the Dispatch Supervisor on the night shift.

39.    Officer Pearson was on duty and therefore arrived at the Dispatch Unit wearing his police uniform and carrying his department-issued badge and firearm.

35.40. The WestCO Dispatch Unit is not open to the public. and Officer Pearson used the gate code to get through the perimeter security fence and access the door to dispatch.

36.41. Officer Pearson knew the code and was able to access the WestCO Dispatch Unit only because of his position as an Olathe police officer.

42.    Officer Pearson made his way to Ms. Wardlaw's office, which was locked.

37.43. Officer Pearson tapped on Ms. Wardlaw's office window on the night of the incident and mouthedstated that he needed to talk to her. about a work-related issue.

44.    Given Officer Pearson's position   A witness who observed Pearson get Wardlaw's attention stated to Montrose Police Department investigators that it "appeared as an Olathe officer, Ms.though he might need something official."

38.45. Despite not wanting to engage with Officer Pearson, Ms. Wardlaw reasonably believed she was not free to ignore him because he was an officer of one of WestCO's member agencies.

46.    Ms. Wardlaw let him in, however sheAs a supervisor it was Ms. Wardlaw's job to communicate and talk to the employees of WestCO's member agencies and answer any questions they may have about dispatch.

47.    Ms. Wardlaw's job description required her to "communicate and interact with all levels of personnel" within WestCO's member agencies, including the Olathe Police Department.

48.    Ms. Wardlaw's job description required her to "Facilitate communication and positive interaction to maintain an effective working relationships between dispatch and first responder personnel," such as Officer Pearson.

49.    WestCO Executive Director Mandy Stollsteimer had told Ms. Wardlaw when she first began her job at WestCO that dispatchers were expected to be acquainted with the officers of the user agencies that WestCO worked with. It was WestCO policy that dispatchers had to go on ride-alongs with police officers to meet and get to know them and understand their jurisdiction.

50.    Ride-alongs were part of WestCO dispatcher training and every WestCO dispatcher was required to do a ride-along with each of WestCO's member agencies.

51.    Director Stollsteimer required dispatchers to keep WestCO's member agencies happy and required that WestCO dispatchers knew the officers that worked for each user agency.

52.     WestCO maintained an "open-door policy" with member agency officers and any of them could walk onto the dispatch floor at WestCO to ask questions.

53.     Therefore, member agency officers routinely came into WestCO.

54.     When Officer Pearson told Ms. Wardlaw that he wanted to talk to her about official business, she believed she had no choice but to let him into her office.

55.     Officer Pearson thus used his official position to exert influence or physical control over Ms. Wardlaw.

39.56. However, Ms. Wardlaw made sure to leave the door and blinds open, because she felt uncomfortable being alone with Officer Pearson.

40.57. After entering her office, Officer Pearson gave Ms. Wardlaw a "side hug."

41.58. He then began asking Ms. Wardlaw about marital problems with her husband, but Ms. Wardlaw made clear that she did not want to discuss the situation with him.

42.     Officer Pearson then inquired about a work-related issue.

59.     Officer Pearson asked Ms. Wardlaw about Spillman (the dispatch system) and abbreviations used by the Montrose Police Department and Montrose County Sheriff's Office to close out calls for service. He asked if OPD could do something similar.

43.60. In response, Ms. Wardlaw went to her desk, sat down, and pulled up a screen to respond toshow Officer Pearson's inquiryPearson how the abbreviations worked in Spillman and began moving windows on programs on her computer.

44.61. Ms. Wardlaw felt Officer Pearson approach from behind her.

45.62. Believing that Officer Pearson was coming closer for a better view of the computer screen, Ms. Wardlaw moved to the side.

46.63. Instead, Officer Pearson wrapped both his arms around Ms. Wardlaw and pressed them onto her breasts.

64.    Ms.Ms. Wardlaw froze, stunned that a police officer had grabbed her in such a manner.

47.65. Once she regained her composure, Ms. Wardlaw elbowed Officer Pearson away in protest.

48.66. Nathan Compton, a WestCO dispatcher who had witnessed the assault, quickly came into Ms. Wardlaw's office and told Officer Pearson to leave the Dispatch Unit.

49.67. Traumatized by Officer Pearson's brazen sexual assault, Ms. Wardlaw crawled into a fetal position in her chair, shaking and noncommunicative.

50.68. After an hour, Ms. Wardlaw was finally able to go to the bathroom to wash her face.

51.69. Upon recovering from the shock of the assault, Ms. Wardlaw immediately sent an email to WestCO Executive Director Mandy Stollsteimer to report what had occurred.

52.70. After leaving the WestCO Dispatch Unit, Officer Pearson texted Ms. Wardlaw and also called her personal phone.

53.71. He also called dispatch following the incident to attempt to speak with Ms. Wardlaw.

54.72. Ms. Wardlaw did not respond to any of these communication efforts.

### OLATHE AND WESTCO KNEW OFFICER PEARSON HARASSED FEMALE DISPATCHERS

55.73. In the ensuing investigation into Officer Pearson, investigators from the Montrose Police Department ("MPD") discovered that multiple female dispatchers at WestCO had experienced and reported similar sexual harassment and many other employees had either witnessed the harassment or were generally aware of it.

56.74. MPD also discovered that nearly everyone who worked in the Dispatch Unit in WestCO knew about Officer Pearson's sexual harassment of female dispatchers along with OPD Chief Pacheco, who was also a WestCO Board member, OPD Sergeant Black, and Town of Olathe Mayor Roland Hutson.

57.75. Nevertheless, despite having direct knowledge of the harassment, WestCO and Olathe simply ignored the problem.

58.76. Officer Pearson had harassed Kylie Younger, a female dispatcher, by touching her in ways that made her uncomfortable, including by:

    a.  Rubbing her shoulders;

    b.  Grabbing her sides three times during a single shift;

    c.  Touching her sides twice even after she finally asked him to stop;

    d.  Poking her beneath her breast and on her stomach, which was witnessed by Olathe Mayor Hutson. In response to the touching, she loudly yelled at Officer Pearson, which resulted in everyone in dispatch turning around.

59.77. Officer Pearson also harassed and touched another female WestCO dispatcher in a similar manner.

60.78. Ms. Younger also made the following statements to law enforcement:

    a. "Generally we are all kind of all on high alert when he [Pearson] comes in."

    b. "We know that he has had a history of making people feel uncomfortable."

    c. "Its been in conversation in there [dispatch] before how he tries to kind of like grope certain people in there".

    d. "[Pearson] tends to gravitate towards the female workers."

    e. "I know he has been told by his superior [Sergeant Black] not to touch people in dispatch."

    f. "He has been told by [Olathe Mayor] Roland [Hutson] not to touch people in dispatch."

    g. "A few nights before [the April 4, 2021 assault] he had been asked by Nathan [Compton] not to touch anyone in there."

    e. "With [Ms. Wardlaw], it's been reoccurring that [Officer Pearson] has been trying to hug her or grab her knees.  He has been asked multiple times to stop."

61.79. Another female WestCO employee interviewed by MPD conveyed that Officer Pearson had grabbed her sides between September and October of 2020 while she was on a call. She indicated that Officer Pearson's unwelcome touch made her angry.

62.80. This female WestCO employee confirmed that she was present when Officer Pearson rubbed the shoulders of another female WestCO employee. She also stated that she was aware of Officer Pearson having touched Ms. Wardlaw inappropriately several times and that Ms. Wardlaw had told her about an incident in

which Officer Pearson placed his hand on her thigh, rubbed it, and then came behind her and rubbed her shoulders.

~~63.~~81. Nathan Compton, a male WestCO dispatcher, told MPD that there had been several complaints about Officer Pearson touching and hugging people.

~~64.~~82. Mr. Compton stated that he had seen Officer Pearson hug every female in the room at one point in time or another.

~~65.~~83. He told investigators that at least three female WestCO dispatchers were "terrified" of Officer Pearson because of the inappropriate touching.

~~66.~~84. WestCO supervisors were aware of the dispatchers' concerns regarding Officer Pearson but did not take appropriate action to prevent Officer Pearson from coming into the Dispatch Unit.

85.     Mr. Compton told investigators that it was his understanding that Sergeant Black had been told about the situations, but he was not aware of any ramifications or corrective actions that were taken as a result.

~~67.~~86. Brock Gatt, who worked the guard station at WestCO, described Officer Pearson as "touchy feely."

87.     Mr. Gatt stated he ~~had heard~~started hearing about incidents involving Officer Pearson touching Ms. Wardlaw's knee ~~and stated~~within three months of starting his job at WestCO in November of 2018.

~~68.~~88. Mr. Gatt told investigators that Officer Pearson "seemed focused on [Ms. Wardlaw]."

69.89. Olathe Mayor Roland Hutson was working as a dispatcher at WestCO on the night of April 4, 2021, when Ms. Wardlaw was sexually assaulted by Officer Pearson.

70.90. Mayor Hutson told investigators that as soon as he heard a commotion outside of Ms. Wardlaw's office on April 4, he "knew that Officer Pearson had probably touched her inappropriately or had tried to hug her, which [Ms. Wardlaw] has mentioned in the past makes her very uncomfortable."

71.91. Mayor Hutson had also previously witnessed Officer Pearson harassing other female dispatchers.

72.92. For example, Mayor Hutson personally observed Officer Pearson poking a female dispatcher in the ribs.

73.93. The female dispatcher confided in Mayor Hutson later that Officer Pearson's conduct "creeped her out."

74.94. Mayor Hutson claimed that he confronted Officer Pearson after the incident and told him, "please don't touch anybody."

75.95. Sergeant Black had also told Mayor Hutson that Officer Pearson had been warned, "if you visit dispatch, you do not touch any of the dispatchers there."

76.96. Olathe Police Department Chief Rogelio Pacheco, a Director on WestCO's Board of Directors, received prior complaints from dispatch staff regarding Officer Pearson's behavior.

97.   In a conversation with MPD Detectives on April 8, 2021, Chief Pacheco confirmed that he had received a prior complaint from WestCO dispatch staff regarding Officer Pearson.

98.   Chief Pacheco recalled the complaint coming from a WestCO female employee and conveyed by a male supervisor.

99.   Chief Pacheco told investigators that he believed Sergeant Black had documented the complaint and told Officer Pearson that he was not allowed to go to the WestCO Dispatch Unit and ~~that~~if he had to go to dispatch he was to notify of the reason for going.

~~77.~~100.   Chief Pacheco also told investigators that the restriction was communicated to WestCO.

~~78.~~101.   Sergeant Black ~~was aware of a complaint,~~recalled that approximately two years prior to the April 4, 2021 assault of Ms. Wardlaw, ~~that~~a complaint had come in from WestCO about Officer Pearson ~~was~~ inappropriately touching the dispatchers.

~~79.~~102.   Sergeant Black told investigators that Chief Pacheco asked her to deal with this complaint, and she asked Chief Pacheco if she should document the complaint via a counseling letter.

~~80.~~103.   Chief Pacheco instructed Sergeant Black not to issue Officer Pearson a counseling letter, and to just "talk" to him instead.

~~81.~~104.   Sergeant Black ~~claimed to~~told investigators that she ~~told~~ had counseled Officer Pearson "multiple times" that he was not to go to dispatch unless he needed to be there and not to touch the dispatchers while he was there.

105.   Sergeant Black stated that the town manager had told her that Officer Pearson was "one that is down there a lot."

82.106.     Sergeant Black also received another complaint from a female WestCO dispatcher regarding an incident where Officer Pearson touched the dispatcher, making her uncomfortable.

83.107.     Sergeant Black did not document the complaint or take any other action in response.

84.108.     Additionally, Ms. Wardlaw herself had raised concerns regarding Officer Pearson's behavior at WestCO supervisory meetings, during which Director Stollsteimer was present.

85.109.     Ms. Wardlaw raised the issue of Officer Pearson's harassment three to four times to WestCO supervisors over a two-year span, from approximately 2019 to 2021.

86.110.     Director Stollsteimer replied that Officer Pearson's supervisor (Sergeant Black) did not want him coming into the Dispatch Unit.

87.111.     That was WestCO's only response to Ms. Wardlaw's complaints.

88.112.     Ms. Wardlaw also spoke to Cheryl Hill, the Telecommunications Supervisor at WestCO, about Officer Pearson's behavior in the Dispatch Unit.

89.113.     Ms. Hill told Ms. Wardlaw that Ms. Wardlaw was not the only one who thought Officer Pearson's behavior was creepy.

90.114.     Ms. Wardlaw also discussed Officer Pearson's harassing behavior with Amber Lillard, a WestCO supervisor (and the daughter of Gene Lillard, who currently serves on the Board for WestCO).

91. 115.    Ms. Lillard told Ms. Wardlaw that Ms. Lillard knew that Officer Pearson's behavior made other WestCO employees uncomfortable.

92. 116.    Olathe and the OPD knew of Officer Pearson's harassing behavior.

93. 117.    Neither Olathe nor the OPD took any appropriate steps to prevent Officer Pearson from continuing to harass female dispatchers.

94. 118.    WestCO knew of Officer Pearson's harassing behavior.

95. 119.    WestCO did nothing to prevent Officer Pearson from continuing to harass female dispatchers.

### MS. WARDLAW PURSUED CRIMINAL CHARGES, AND WESTCO IMMEDIATELY RETALIATED AGAINST HER

96. 120.    On April 6, 2021, two days after Officer Pearson's assault, Ms. Wardlaw met with Director Stollsteimer to discuss the incident.

97. 121.    Director Stollsteimer advised Ms. Wardlaw that she had two options: (1) she could allow Director Stollsteimer to speak to OPD Chief Rogelio Pacheco and lodge a complaint with OPD; or (2) Ms. Wardlaw could file a report with the Montrose Police Department and have them investigate the incident.

98. 122.    Ms. Wardlaw was concerned about retaliation because Chief Pacheco sat on WestCO's Board of Directors.

99. 123.    In addition, Ms. Wardlaw's prior complaints about Officer Pearson, including to his supervisor, Sergeant Black, had not put a stop to his harassment.

100. 124.    Director Stollsteimer recommended that Ms. Wardlaw not report Officer Pearson's sexual assault.

101.125.    Director Stollsteimer told Ms. Wardlaw that, "if I was out at a bar and had been drinking and some guy grabbed my breasts, I would tell him to knock it off and go on."

102.126.    Ms. Wardlaw was shocked by Director Stollsteimer's advice.

103.127.    Despite her concerns about retaliation, Ms. Wardlaw decided to file a police report due to the longstanding sexual harassment she had endured from Officer Pearson.

104.128.    Director Stollsteimer assured Ms. Wardlaw that WestCO would support her and that WestCO would change the gate code to the Dispatch Unit to make sure that Officer Pearson could not just walk in and assault dispatchers.

105.129.    Shortly after, Ms. Wardlaw met with Montrose Police Department ("MPD") Detective Michelle Berry to provide a statement regarding Officer Pearson's assault.

106.130.    The April 4, 2021 assault took an immediate and devastating toll on Ms. Wardlaw, and she began experiencing panic attacks in and outside of the workplace.

107.131.    Shortly after making the difficult decision to report Officer Pearson's assault to law enforcement, Ms. Wardlaw spoke to Director Stollsteimer about the panic attacks she was experiencing.

108.132.    That same evening when Ms. Wardlaw was in the office with another supervisor, she experienced a panic attack.

109.133.    She texted Director Stollsteimer and advised that she needed to go home.

110.134.    When she returned the next day, Ms. Hill made a comment to Ms. Wardlaw about how it must be nice to choose her own schedule and leave whenever she wanted.

111.135.    Ms. Wardlaw started seeing a therapist for PTSD and panic attacks.

112.136.    She told Director Stollsteimer that she was considering applying for FMLA leave because her mental health seemed to be getting worse.

113.137.    The gate code that Director Stollsteimer promised to change had not been changed.

114.138.    Director Stollsteimer had not even bothered to train WestCO employees on keeping the Dispatch Unit secured.

115.139.    Employees who were not aware of Officer Pearson's behavior would routinely prop the door open to the Dispatch Unit.

116.140.    WestCO's failure to secure the workplace—despite Director Stollsteimer's assurances—exacerbated Ms. Wardlaw's anxiety that Officer Pearson could return at any moment.

117.141.    At one point, Ms. Wardlaw became frustrated by the perpetually open door and yelled at staff to close it.

118.142.    Ms. Wardlaw sent an email to Director Stollsteimer advising her of the failure of dispatchers to keep the door closed and reminding Director Stollsteimer of WestCO's promise to change the door code.

119.143.    Ms. Wardlaw did not receive a response to her email.

120.144.     WestCO did not take any steps to limit Officer Pearson's access to the Dispatch Unit.

121.145.     Ms. Wardlaw again confronted Director Stollsteimer about the failure of dispatchers to keep the door closed, the impact that it was having on her, and the general feeling of unsafety that she was experiencing at WestCO.

122.146.     Director Stollsteimer told Ms. Wardlaw she would send out an office-wide email about the issue.

123.147.     Director Stollsteimer did not send out an office-wide email about the issue.

124.148.     In the same conversation, Director Stollsteimer asked Ms. Wardlaw about the status of MPD's criminal investigation into Officer Pearson.

125.149.     Ms. Wardlaw responded that the investigation had uncovered many other victims over the years and that the investigators indicated an interest in pursuing charges against people in positions of authority who knew of Officer Pearson's harassment and did nothing.

126.150.     Ms. Wardlaw told Director Stollsteimer that she was proud of herself for speaking up and being a voice for others.

127.151.     Director Stollsteimer's demeanor towards Ms. Wardlaw immediately changed.

128.152.     Director Stollsteimer stopped having conversations with Ms. Wardlaw, and her behavior became more guarded.

129.153.       Director Stollsteimer also became increasingly critical, questioning Ms. Wardlaw's decisions on training matters that had never been a concern before.

130.154.       Ms. Wardlaw left for vacation on May 13, 2021.

131.155.       On the afternoon of May 18, Ms. Wardlaw received a call and voicemail on her personal phone from Director Stollsteimer.

132.156.       When she returned the call, Director Stollsteimer informed Ms. Wardlaw that WestCO was placing her on administrative leave because she was the subject of an internal affairs ("IA") investigation and that the investigation was being handled by an outside firm.

133.157.       Shocked, Ms. Wardlaw asked what the investigation was about.

134.158.       Director Stollsteimer refused to provide details and told her that the information was in the IA letter sent to Ms. Wardlaw via email.

135.159.       Although Director Stollsteimer waited until May 18, 2021, when Ms. Wardlaw was on vacation, to inform her of the IA investigation, Director Stollsteimer begun the investigation on May 6, 2021.

136.160.       In her five years of working for WestCO, Ms. Wardlaw could not recall a single instance where an employee had been placed on administrative leave while under an IA investigation, nor could she recall an IA investigation being handled by an outside investigator.

137.161.       When Ms. Wardlaw got home the next day, she tried to log into her WestCO email to review the IA letter, but she was unable to access her account.

138.162.      Later that day, Director Stollsteimer called her to tell her that she was locked out of her work accounts, and that her security door card had been shut down so she would not be able to access the facility.

139.163.      Ms. Wardlaw learned shortly thereafter that Director Stollsteimer had sent out an email to the entire dispatch staff stating that WestCO had placed Ms. Wardlaw on administrative leave, that she was not to be spoken to, and staff should report any contact by Ms. Wardlaw to a WestCO supervisor.

140.164.      Director Stollsteimer had also stepped onto the dispatch floor during each shift and announced to the staff that Ms. Wardlaw was under investigation and should neither be spoken to nor allowed into the facility.

141.165.      Because her access had been revoked, Ms. Wardlaw was unable to review the IA letter to understand the allegations against her.

142.166.      On May 26, 2021, Ms. Wardlaw was interviewed by Jessica Tice, WestCO's outside investigator, and was handed a sealed envelope with a copy of her IA papers.

143.167.      Ms. Wardlaw learned, for the first time, that she was accused of workplace bullying and nepotism.

144.168.      Specifically, Ms. Wardlaw was accused of having a personal relationship with Mr. Compton and for making the following comments towards other dispatchers: "fat assess," "snitches get stiches," and "whoever she doesn't like doesn't work there long."

145.169.    The allegations shocked Ms. Wardlaw, as she had never received any complaints or was made aware of concerns related to the allegations.

146.170.    Ms. Wardlaw denied ever making the listed statements.

147.171.    The investigation made no findings regarding the nepotism charge but found Ms. Wardlaw to have violated the policy against workplace bullying due to the comments allegedly made, the code of ethics for favoritism, and lack of accountability towards Mr. Compton.

148.172.    On June 9, 2021, Director Stollsteimer met with Ms. Wardlaw to discuss the conclusions of WestCO's investigation and to inform Ms. Wardlaw that WestCO intended to terminate her employment.

149.173.    Ms. Wardlaw submitted a rebuttal to WestCO's investigation on June 10, 2021.

150.174.    WestCO terminated Ms. Wardlaw's employment the very next day, June 11, 2021.

151.175.    The decision to terminate Ms. Wardlaw's employment was made by WestCO's Board of Directors, which included Olathe Mayor Hutson, and OPD Chief Pacheco.

### OLATHE KNEW OF OFFICER PEARSON'S HARASSMENT OF FEMALE OFFICERS

152.176.    Well before the April 4, 2021 sexual assault of Ms. Wardlaw, Officer Pearson engaged in a conspicuous pattern of sexual harassment.

153.177.    Numerous complaints were made to the OPD regarding Officer Pearson abusing his authority to proposition and harass his female co-workers as well as multiple women in the community.

154.178.    The OPD was aware that Officer Pearson sexually assaulted and harassed his female subordinates at the police department.

155.179.    A female OPD Officer, Eddie Jarrell, was assigned to complete her training with Officer Pearson.

156.180.    Around February/March of 2020, Officer Jarrell relayed several troubling incidents regarding Officer Pearson to Sergeant Black.

157.181.    In one incident Officer Pearson extended his index and middle finger and flicked his tongue between them, lewdly simulating oral sex, and asked Officer Jarrell, "do you like that?"

158.182.    Another incident involved Officer Pearson placing his hand on Officer Jarrell's right thigh and squeezing really hard as she drove a patrol vehicle.

159.183.    Officer Pearson repeatedly grabbed Officer Jarrell's thigh throughout her training.

160.184.    In yet another incident, Officer Pearson placed his hand on Officer Jarrell's upper inner thigh and made a suggestive swiping motion towards her crotch while she was driving the patrol vehicle.

161.185.    After this incident, Officer Jarrell complained to Sergeant Black and asked to be removed from training with Officer Pearson.

~~162.~~186.    Sergeant Black told Officer Jarrell that Officer Pearson acted similarly towards the WestCO dispatchers.

187.  Sergeant Black ~~told MPD investigators~~initially stated that she ~~recalled~~drafted a ~~female officer, training under Officer Pearson, complain~~Letter of Counseling in response to ~~her about an~~this incident ~~where Officer Pearson touched her and making her uncomfortable.~~but was unable to provide a copy to MPD investigators.

188.   Forensic analysis of Sergeant Black's computer reveleated that no Letter of Counseling was present on the hard drive.

~~163.~~189.    It is OPD policy that two Letters of Reprimand result in the termination of an employee.

190.   Sergeant Black ~~did~~ explained that the letter she would have drafted regarding Officer Jarrell would have been a Letter of Counseling and not ~~document the trainee's~~a Letter of Reprimand.

191.   Officer Jarrell's complaint ~~or take any~~was not documented and no disciplinary action ~~toward~~was taken towards Officer ~~Pearson.~~Pearson..

~~164.~~192.    Chief Pacheco advised MPD investigators that Sergeant Black had hold him about Ms. Jarrell's complaints against Officer Pearson and he had told Sergeant Black to "talk to him [~~Pearson.~~]".

193.   Upon information and belief no Letter of Reprimand was ever issued to Officer Pearson by OPD.

**OFFICER PEARSON ABUSED THE AUTHORITY OF HIS OFFICE TO FURTHER HIS INAPPROPRIATE SEXUAL PURSUITS**

165.194.      Officer Pearson also has a long history of abusing his power as a law enforcement officer to inappropriately pursue or further sexual relationships, including inappropriately propositioning women in his custody or while on duty, and inappropriately exercising law enforcement discretion to favor women with whom he was sexually involved.

166.195.      Chief Pacheco and Sergeant Black admitted to MPD investigators that they were aware of additional complaints received regarding Officer Pearson's inappropriate sexual conduct towards women in the community.

196.    Chief Pacheco told investigators that he was aware of a complaint made about Office Pearson sleeping with Tierra Lewis "on the side, off duty, on duty…"

197.    He stated that he asked Sergeant Black to look into the allegation.

198.    Chief Pacheco admitted that while he did have a conversation about Officer Pearson sleeping with Ms. Lewis with the Olathe Town Manager, he did not document the complaint, investigate, or follow up with Sergeant Black about it.

199.    Chief Pacheco stated that he did tell Officer Pearson to "cool it."

200.    Sergeant Black stated that she was aware of a complaint regarding Officer Pearson's sexual relationship with someone outside of his current girlfriend but that it was her understanding that Chief Pacheco had "dealt with it."

201.    Officer Pearson told MPD investigators that he had never been asked about Tierra Lewis by anyone at OPD and was not aware of any investigation by OPD into allegations regarding her.

202.   Officer Pearson did admit that he was aware that Tara Wagner had filed a complaint against him with Chief Pacheco.

167.203.   MPD investigators spoke to Tara Wagner, who alleged that Officer Pearson propositioned her, while she was in his custody, to have a threesome with him and a woman he was seeing.

168.204.   MPD investigators interviewed Nicole Skowronek, who alleged that Officer Pearson had "grabbed [her] crotch" during proceedings in the Olathe Municipal Court.

169.205.   MPD investigators also interviewed Stephanie Turner, who alleged that Officer Pearson propositioned her multiple times and offered her a *quid pro quo*, telling her that he would look the other way with respect to his law enforcement duties if she would return the favor by yielding to his sexual advances.

### OPD HIRED OFFICER PEARSON DESPITE A LONG HISTORY OF INAPPROPRIATE BEHAVIOR

170.206.   Officer Pearson's sexual harassment did not begin at the OPD. Rather, Officer Pearson has a long track record of troubling sexual harassment in the workplace.

171.207.   Officer Pearson's ex-wife, Nora Hammer, who has known him for over fifteen years, told MPD investigators that Officer Pearson's assault of Ms. Wardlaw "isn't the first time… it has happened repeatedly at a few other jobs … it was a matter of time before it happened again."

172.208.    Officer Pearson previously worked at Ridgway State Park, Community Corrections in Montrose, the San Miguel County Sheriff's Office, and finally at the OPD.

173.209.    While employed at Ridgeway State Park, Officer Pearson was written up for discharging his weapon in the household.

174.210.    Officer Pearson was also found to have had an inappropriate relationship with a young woman who worked in the state park education program.

175.211.    Officer Pearson was fired from his next job at Community Corrections after only ten days due to "inappropriate contact with a co-worker" and because he made female staff feel uncomfortable.

176.212.    Officer Pearson then found employment with San Miguel County Sheriff's Office.

177.213.    There, Ms. Hammer told investigators, Officer Pearson "was involved with a few women" who were co-workers.

178.214.    There were also allegations of "inappropriate contact" between Officer Pearson and an inmate.

179.215.    The San Miguel County Sheriff's Office placed Officer Pearson on leave without pay while an internal investigation was conducted.

180.216.    Ms. Hammer told investigators that she found it surprising that Officer Pearson was getting "hired and hired again," despite his track record of inappropriate behavior.

181.217.    She questioned if "anybody [did] their homework and actually investigat[ed] what kind of a person he is."

182.218.    Olathe, Chief Pacheco, and Sergeant Black, knew of Officer Pearson's harassment of the female dispatchers at WestCO, female officers working at OPD, and his sexual harassment of women in the community.

219.    Despite having direct knowledge of the harassmentsimilar past wrongdoing, Olathe, its Police Chief, and Pearson's supervising sergeant simply ignored the problem and allowed himOfficer Pearson to continue to engage with public and victimize countless women protected by the power of the badge over the span of his employment as a police officer in Olathe.

183.220.    The deliberate indifference and inaction coupled with inadequate screening, training, and supervision by Olathe resulted in the violation of Plaintiff's constitutional rights and caused serious injury and harm.

## VI. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. §§ 2000e-2(a)**
**Sex-Based Hostile Work Environment under Title VII**
**(Against Defendant WestCO)**

184.221.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

185.222.    Defendant WestCO discriminated against Amy Wardlaw, in violation of section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), by subjecting her to sexual harassment and by tolerating a sexually hostile work environment.

186.223.     The offensive sexual conduct described in the preceding paragraphs was and is sufficiently severe or pervasive to have altered the terms and conditions of employment for Ms. Wardlaw.

187.224.     The sexual harassment and hostile work environment to which Ms. Wardlaw was subjected was tolerated by WestCO and occurred on a frequent and routine basis over a substantial period of time.

188.225.     Defendant WestCO knew or should have known of the sexually hostile work environment because its executive director, other WestCO supervisors, at least one WestCO Board member, and nearly everyone who worked in the dispatch unit knew about the harassment. Moreover, the harassment was frequent and notorious in nature, and Ms. Wardlaw had complained about it.

189.226.     Defendant WestCO failed to take prompt or effective action to prevent, correct, or remedy the sexually hostile work environment.

190.227.     The effect of WestCO ignoring the hostile work environment deprived Ms. Wardlaw of equal employment opportunities and otherwise adversely affected her status as an employee, because of her sex.

191.228.     The unlawful employment practices complained of above were intentional.

192.229.     The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Ms. Wardlaw.

193.230.     As a result of the events and actions described above, Ms. Wardlaw was deprived of equal employment opportunities, experienced emotional pain, suffering,

inconvenience, loss of enjoyment of life, and humiliation, and was and is otherwise adversely affected because of her sex.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 2000e-3(a)**
**Retaliation Under Title VII**
**(Against Defendant WestCO)**

~~194.~~231.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

~~195.~~232.    Defendant engaged in unlawful employment practices in violation of Section 704 of Title VII, 42 U.S.C. § 2000e-2(a), by retaliating against Plaintiff.

~~196.~~233.    Plaintiff engaged in protected activity under § 704 of Title VII, by opposing what she reasonably believed was an unlawful discriminatory employment practice based on sex.

~~197.~~234.    Plaintiff reported the sexual harassment to WestCO Executive Director Mandy Stollsteimer.

~~198.~~235.    Plaintiff spoke with other managers about the hostile work environment she and other dispatchers were subjected to from Officer Pearson.

~~199.~~236.    Plaintiff initiated a criminal investigation and gave statements to MPD about the sexual assault and the prolonged sexual harassment she was subjected to at WestCO.

~~200.~~237.    Defendant, acting through their officials, managers, supervisors, and other employees, engaged in an orchestrated pattern of retaliation, including isolating Plaintiff, branding her as a problem employee, initiating a pretextual internal investigation, and ultimately terminating her from her employment.

201.238.   The effect of the practices complained of in the forgoing paragraphs has been to deprive Plaintiff of equal employment opportunities and terminate her as an employee because she engaged in protected activity.

202.239.   The unlawful employment practices complained of in the foregoing paragraphs were intentional.

203.240.   The unlawful employment practices complained of above were done with malice or with reckless indifference to Plaintiff's federally protected rights, and Plaintiff was aggrieved by the retaliatory practices.

204.241.   As a result of the events and actions described above, Plaintiff was deprived of equal employment opportunities, experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and was and is otherwise adversely affected because of Defendants' unlawful retaliation.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment Retaliation
### (Against Defendant WestCO)

205.242.   The allegations in the foregoing paragraphs are hereby incorporated by reference.

206.243.   Defendant's actions violated constitutionally protected speech under the First Amendment of the United States Constitution by retaliating against Plaintiff.

207.244.   Sexual harassment by a police officer is a matter of public concern to the community.

208.245.   Plaintiff engaged in protected speech objecting to, and shedding light on, a pattern of sexual harassment by a police officer within the OPD, an agency tasked

with protecting the public from sexual assault, domestic violence, molestation, and other such crimes.

209.246.    Plaintiff engaged in constitutionally protected activity to bring the rampant sexual harassment of Office Pearson to the attention of WestCO, the OPD, and the public, and in educating the public about the harassment through the investigation.

210.247.    Plaintiff's speech was outside the scope of her ordinary job duties.

211.248.    Plaintiff's speech was calculated to expose a police officer's wrongdoing.

212.249.    As described herein, WestCO's retaliatory conduct occurred rapidly after Plaintiff engaged in these constitutionally protected activities.

213.250.    WestCO's retaliatory acts were substantially motivated by Plaintiff's complaints and communication with MPD, and/or in anticipation of her further participation in proceedings against Officer Pearson and other officials at WestCO.

214.251.    At all relevant times, Plaintiff had a clearly established right under the First Amendment to be free from retaliation.

215.252.    Defendant engaged in its conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights, and is therefore liable to Plaintiff.

216.253.    As a proximate result of Defendant's first amendment violations, Plaintiff suffered and continues to suffer injuries, damages, and losses.

217.254.    The acts or omissions of Defendant were the legal and proximate cause of damages suffered by Plaintiff.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 - Fourteenth Amendment - Equal Protection**
**(Against WestCO)**

255.   The allegations in the foregoing paragraphs are hereby incorporated by reference.

256.   Plaintiff brings claims for violation of equal protection under the Fourteenth Amendment to the United States Constitution through the remedies provided by 42 U.S.C. § 1983.

257.   Plaintiff is female and thus a member of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

258.   Defendant WestCO, directly or indirectly, in concert, acting under color of State law, discriminated against Amy Wardlaw, in violation of the Equal Protection Clause of the Fourteenth Amendment, by maintaining a custom or practice of permitting male police officers to sexually harass its female dispatchers.

259.   The sexual harassment that Plaintiff was subjected to, was so severe and pervasive at WestCO that it was an accepted custom or practice.

260.   Management at WestCO as well as members of the Board were aware of the ongoing harassment, but tacitly condoned the conduct.

261.   Defendant WestCO failed to restrict police officers from sexually harassing the female dispatchers.

262.   Defendant WestCO failed to provide training or effective reporting procedures, resulting in a climate rife with sexual harassment.

263.   Defendant WestCO unlawfully denied Plaintiff the benefits, privileges, opportunities, and terms and conditions of her employment due to her female sex.

264.   The unconstitutional practices complained of above were done with malice or reckless indifference to Plaintiff's federally protected rights.

265.   As a proximate result of Defendants' equal protection violations, Plaintiff suffered and continues to suffer injuries, damages and losses.

266.   The acts or omissions of each Defendant were the legal and proximate cause of damages suffered by Plaintiff.

### FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 - Fourteenth Amendment - Equal Protection
**(Against Defendant Pearson)**

218.267.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

219.268.    Plaintiff brings claims for violation of equal protection under the Fourteenth Amendment to the United States Constitution through the remedies provided by 42 U.S.C. § 1983.

220.269.    Plaintiff is female and thus a member of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

221.270.    At all times relevant to this claim, Officer Pearson was acting under the color of state law on behalf of the Olathe Police Department in his capacity as an Olathe Police Officer.

222.271.   Officer Pearson's conduct toward Ms. Wardlaw, as described herein, constituted sexual assault or harassment under color of state law, in violation of the Fourteenth Amendment's equal protection guarantee.

223.272.   As a proximate result of Defendant Pearson's conduct, Plaintiff suffered and continues to suffer injuries, damages, and losses.

### FIFTHSIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment Substantive Due Process
### (Against Defendant Pearson)

224.273.   The allegations in the foregoing paragraphs are hereby incorporated by reference.

225.274.   At all times relevant to this claim, Officer Pearson was acting under the color of state law on behalf of the Olathe Police Department in his capacity as an Olathe Police Officer.

226.275.   Officer Pearson's conduct, as described herein, intended to injure Ms. Wardlaw in a way unjustifiable by any government interest.

227.276.   Officer Pearson's conduct, as described herein, deprived Ms. Wardlaw of her fundamental right to bodily integrity.

228.277.   Officer Pearson's conduct, as described herein, shocks the conscience.

229.278.   Officer Pearson's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Mr. Wardlaw's federally-protected rights.

230.279.     As a proximate result of Defendant Pearson's conduct, Plaintiff suffered and continues to suffer injuries, damages, and losses.

### ~~SIXTH~~SEVENTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Unlawful Seizure
### (Against Defendant Olathe and Pearson)

280.   The allegations in the foregoing paragraphs are hereby incorporated by reference.

281.   At all times relevant to this claim, Officer Pearson was acting under the color of state law on behalf of Olathe in his capacity as an Olathe Police Officer.

282.   Ms. Wardlaw had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in her person against unreasonable seizure.

283.   In his assault of Ms. Wardlaw, Officer Pearson used force and caused her to be unlawfully detained in violation of her Fourth Amendment right to be free from unreasonable seizure.

284.   In view of all of the circumstances surrounding the incident, a reasonable person grabbed by a uniformed, on-duty police officer would have believed that she was not free to leave.

285.   When he grabbed Ms. Wardlaw, Officer Pearson terminated Ms. Wardlaw's freedom of movement through means intentionally applied.

286.   Officer Pearson's seizure of Ms. Wardlaw was objectively unreasonable.

287.   Officer Pearson's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Ms. Wardlaw's federally-protected rights.

288.   Officer Pearson engaged in the acts and omissions described herein pursuant to the customs, policies, procedures, and practices of Defendant Olathe, which failed to adequately screen, train, and supervise their officers and encouraged, tolerated, and ratified the use of unreasonable seizure and deprivation of constitutionally-protected interests by the officers.

289.   As a proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer injuries, damages and losses.

290.   The acts or omissions of each Defendant were the legal and proximate cause of damages suffered by Plaintiff.

### EIGHTH CLAIM FOR RELIEF
### Colo. Const. Art. II, Section 7 - Unlawful Seizure
### (Against Defendant Olathe and Pearson)

291.   The allegations in the foregoing paragraphs are hereby incorporated by reference.

292.   Colo. Const. Art. II, Sec. 27 provides that "the people shall be secure in their persons… from unreasonable searches and seizures."

293.   Colo. Const. Art. II, Section 7 guarantees rights similar to those protected by the Fourth Amendment of the United States Constitution. These constitutional provisions are distinct, and the Colorado Constitution affords broader protections than

the U.S. Constitution. *People v. McKnight,* 446 P.3d 397, 408 (Colo. 2019); *People v. Oates,* 698 P.2d 811 (Colo. 1985).

294.    Defendant Pearson acted under color of state law and within the course and scope of his employment as law enforcement officer employed by the Olathe Police Department at all times relevant to the allegations in this Complaint.

295.    At all relevant times, Defendant Pearson was a "peace officer" under C.R.S. 24-31-901(3) employed by OPD and therefore subject to C.R.S. 13-21-131.

296.    In his assault of Ms. Wardlaw, Defendant Pearson used force and caused her to be unlawfully detained in violation of the Constitution of the State of Colorado.

297.    In view of all of the circumstances surrounding the incident, a reasonable person grabbed by a uniformed, on-duty police officer would have believed that she was not free to leave.

298.    When he grabbed Ms. Wardlaw, Officer Pearson terminated Ms. Wardlaw's freedom of movement through means intentionally applied.

299.    Officer Pearson's seizure of Ms. Wardlaw was objectively unreasonable.

300.    Officer Pearson's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Ms. Wardlaw's state-protected rights.

301.    Officer Pearson engaged in the acts and omissions described herein pursuant to the customs, policies, procedures, and practices of Defendant Olathe, which failed to adequately screen, train, and supervise their officers and encouraged,

tolerated, and ratified the use of unreasonable seizure and deprivation of constitutionally protected interests by the officers.

302.    As a proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer injuries, damages and losses.

303.    The acts or omissions of each Defendant were the legal and proximate cause of damages suffered by Plaintiff.

## NINTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Municipal Liability
### (Against Defendant Olathe)

231.304.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

232.305.    Defendant Olathe's conduct was the moving force behind Defendant Pearson's constitutional violations alleged herein.

### *Olathe's Failure to Adequately Screen*

233.306.    Olathe maintained a custom or policy of inadequately screening OPD applicants prior to hiring.

234.307.    Pursuant to this custom or policy, Olathe failed to conduct even basic due diligence before hiring Officer Pearson, which would have uncovered that he had been fired from or left each of his prior positions due to complaints or allegations of sexual harassment against him.

235.308.    Olathe maintained its custom or policy of inadequate screening with deliberate indifference to the risk that it would result in a constitutional violation like those Ms. Wardlaw suffered.

236.309.      Adequate scrutiny of Olathe's screening and hiring policies would have led a reasonable policymaker to conclude that failure to adequately screen and permitting the hiring of candidates who were fired from or left a previous job due to their sexual harassment would lead to further sexual harassment at the OPD, and violations of the Fourteenth Amendment.

237.310.      Olathe could and should have pursued reasonable methods of screening and/or qualifying OPD candidates.

238.311.      Had Olathe adequately screened OPD candidates, Ms. Wardlaw would not have been assaulted.

### Olathe's Failure to Adequately Train

239.312.      Olathe also maintained a custom or policy of inadequately training its officers regarding sexual harassment.

240.313.      Pursuant to this custom or policy, Olathe failed to provide any training to Officer Pearson, even after Olathe knew or should have known that Officer Pearson had engaged in sexual harassment on duty.

241.314.      Olathe maintained its custom or policy of inadequate training with deliberate indifference to the risk that it would result in a constitutional violation like those Ms. Wardlaw suffered.

242.315.      Adequate scrutiny of Olathe's training policies would have led a reasonable policymaker to conclude that failure to provide training to candidates who were fired from or left a previous job due to sexual harassment would lead to further sexual harassment at the OPD, and violations of the Fourteenth Amendment.

243.316.    Olathe could and should have pursued reasonable standards for officer training.

244.317.    Had Olathe ensured that Officers were adequately trained, Ms. Wardlaw would not have been assaulted.

### Olathe's Failure to Adequately Supervise

245.318.    Olathe also maintained a custom or policy of inadequately supervising its officers regarding sexual harassment.

246.319.    Pursuant to this custom or policy, Olathe failed to make any changes in Officer Pearson's supervision to reduce the risk of sexual harassment, even after Olathe knew or should have known that Officer Pearson had engaged in sexual harassment on duty.

247.320.    Olathe maintained its custom or policy of inadequate supervision with deliberate indifference to the risk that it would result in a constitutional violation like those Ms. Wardlaw suffered.

248.321.    Olathe could and should have pursued reasonable methods of supervising Officer Pearson.

249.322.    Had Olathe adequately supervised Officer Pearson, Ms. Wardlaw would not have been assaulted.

### Olathe's Failure to Adequately Discipline

250.323.    Olathe also maintained a custom or policy of inadequately disciplining its officers regarding sexual harassment.

251.324.    Pursuant to this custom or policy, Olathe failed to adequately discipline Officer Pearson, even after Olathe knew or should have known that Officer Pearson had engaged in sexual harassment on duty.

252.325.    Olathe maintained its custom or policy of inadequate discipline with deliberate indifference to the risk that it would result in a constitutional violation like those Ms. Wardlaw suffered.

253.326.    The widespread custom or culture of lack of accountability within the OPD, and custom or practice of inadequately disciplining misconduct emboldened Officer Pearson in his conduct toward Ms. Wardlaw.

254.327.    Olathe could and should have pursued reasonable efforts to discipline Officer Pearson.

255.328.    The constitutional violations against, and harm to, Ms. Wardlaw were a foreseeable consequence of Defendant Olathe's actions and omissions.

256.329.    Defendant Olathe's policies, customs, and/or practices and failure to properly screen, train, supervise, and discipline officers, including Defendant Officer Pearson, were the moving force and proximate cause of the violation of Ms. Wardlaw's constitutional rights.

257.330.    Defendant Olathe's actions and omissions as described herein deprived Ms. Wardlaw of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused her actual physical, economic, and emotional injuries in amounts to be determined at trial.

**SIXTHTENTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Supervisory Liability**
**(Against Defendants Pacheco and Black)**

258.331.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

259.332.    Defendants Pacheco and Black promulgated, implemented, or were otherwise responsible for the training, supervision, and discipline of Defendant Pearson.

260.333.    Defendants Pacheco and Black failed to adequately train Defendant Pearson regarding sexual harassment, even after they knew or should have known that Defendant Pearson had committed sexual harassment on duty.

261.334.    Defendants Pacheco and Black failed to adequately supervise Defendant Pearson, even after they knew or should have known that Defendant Pearson had committed sexual harassment on duty.

262.335.    Defendants Pacheco and Black failed to adequately discipline him for similar misconduct prior to his conduct with respect to Ms. Wardlaw alleged herein.

263.336.    Defendant Pacheco and Black were deliberately indifferent to the obvious risk that inadequate training, supervision, and discipline of officers who have previously engaged in sexual harassment would pose a danger to others, and inevitably result in constitutional violations such as Defendant Pearson's violations alleged herein.

264.337.    These customs, policies, and practices were the driving forces and proximate causes of Defendant Pearson's constitutional violations against Ms. Wardlaw.

265.338.    The acts or omissions of Defendants Pacheco and Black caused Ms. Wardlaw to suffer actual physical, economic, and emotional injuries in amounts to be determined at trial.

**~~SEVENTH~~ELEVENTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 25 – Due Process**
**(Against Defendant Pearson)**

~~266.~~339.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

~~267.~~340.    Defendant Pearson is a "peace officer" under C.R.S. 24-31-901(3) employed by the OPD and therefore subject to C.R.S. 13-21-131.

~~268.~~341.    Plaintiff had a protected Colo. Const. Art. II, Section 25 interest against deprivation of life, liberty, or property without due process of law.

~~269.~~342.    Defendant discriminated against Plaintiff, targeted her, and denied her due process of the law by sexually assaulting her.

~~270.~~343.    Officer Pearson's conduct, as described herein, intended to injure Ms. Wardlaw in a way unjustifiable by any government interest.

~~271.~~344.    Officer Pearson's conduct, as described herein, deprived Ms. Wardlaw of her fundamental right to bodily integrity.

~~272.~~345.    The unconstitutional practices complained of above were done with malice or reckless indifference to Plaintiff's protected rights.

~~273.~~346.    As a proximate result of Defendant's equal protection violations, Plaintiff suffered and continues to suffer injuries, damages, and losses.

274.347.    The acts or omissions of each Defendant were the legal and proximate cause of damages suffered by Plaintiff.

## EIGHTHTWELFTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 3, Section 25, and Section 29 –
### Equal Protection
### (Against Defendant Pearson)

275.348.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

276.349.    Defendant Pearson is a "peace officer" under C.R.S. 24-31-901(3) employed by OPD and therefore subject to C.R.S. 13-21-131.

277.350.    Colo. Const. Art. II, Sec. 3 and Colo. Const. Art. II, Sec. 25 provide that no individual may be denied equal protection of the law based on a suspect classification and that all individuals within the state are guaranteed the equal protection of the law.

278.351.    Colo. Const. Art. II, Section 29 states: Equality of rights under the law shall not be denied or abridged by the state of Colorado or any of its political subdivisions on account of sex.

279.352.    Plaintiff is female and thus a member of a protected class under the Equal Protection Clauses of the Colorado State Constitution.

280.353.    Defendant intentionally discriminated against Plaintiff, targeted her, and denied her equal protection of the law by harassing and sexually assaulting her.

281.354.    The unconstitutional practices complained of above were done with malice or reckless indifference to Plaintiff's rights under the Colorado constitution.

282.355.    As a proximate result of Defendants' equal protection violations, Plaintiff suffered and continues to suffer injuries, damages and losses.

283.356.    The acts or omissions of each Defendant were the legal and proximate cause of damages suffered by Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the Court enter judgment for the following relief:

a.      All declaratory relief and injunctive relief, as appropriate;

b.      Actual economic damages as established at trial;

c.      Compensatory and consequential damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d.      Punitive or exemplary damages for all claims as allowed by law in an amount to be determined at trial;

f.      Pre-judgment and post-judgment interest at the highest lawful rate;

g.      The maximum tax-offset permitted by law;

h.      Attorneys' fees and costs; and

i.      Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully Submitted: June 26, 2023

RATHOD | MOHAMEDBHAI LLC

*/s/ Azra Taslimi*
Azra Taslimi
Felipe Bohnet-Gomez
2701 Lawrence St., Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
at@rmlawyers.com
fbg@rmlawyers.com

ATTORNEYS FOR PLAINTIFF