**COPY**          **SEXUAL ASSAULT**



# MONTROSE POLICE
## Deputy Report for Incident 21-008111

---

| | |
|---|---|
| **Nature:** Sex Offense | **Address:** 1140 N GRAND AVE # 100 |
| **Location:** MPB01 | Montrose CO 81401 |

---

| | | |
|---|---|---|
| **Offense Codes:** SOFT, PBOC, ASIM, MISA | | |
| **Received By:** Drea Cole | **How Received:** T | **Agency:** MPD |
| **Responding Officers:** Michelle Berry | | |
| **Responsible Officer:** Patrick Demers | **Disposition:** CAA 04/06/21 | |
| **When Reported:** 11:54:18 04/06/21 | **Occurred Between:** 11:54:18 04/06/21 and 11:54:18 04/06/21 | |

---

| | | |
|---|---|---|
| **Assigned To:** | **Detail:** | **Date Assigned:** **/**/** |
| **Status:** CAA | **Status Date:** 04/06/21 | **Due Date:** **/**/** |

---

**Complainant:**

| | | |
|---|---|---|
| **Last:** | **First:** | **Mid:** |
| **DOB:** **/**/** | **Dr Lic:** | **Address:** |
| **Race:** | **Sex:** | **Phone:** | **City:** , |

## Offense Codes

| | |
|---|---|
| **Reported:** | **Observed:** SOFT Sex Offense Free Text |
| **Additional Offense:** SOFT Sex Offense Free Text | |
| **Additional Offense:** PBOC Public Order Crimes | |
| **Additional Offense:** ASIM Assault, Simple | |
| **Additional Offense:** MISA Misdemeanor Adult Charged | |

## Circumstances

LT11 Government/Public Bldg
SBM SB217 - Not Completed
VCPI Crime Victim Pamphlet Issued

| | |
|---|---|
| **Responding Officers:** | **Unit :** |
| Michelle Berry | S5 |

| | | |
|---|---|---|
| **Responsible Officer:** Patrick Demers | **Agency:** MPD |
| **Received By:** Drea Cole | **Last Radio Log:** **:**:** **/**/** |
| **How Received:** T Telephone | **Clearance:** CCC Cleared County Citation |
| **When Reported:** 11:54:18 04/06/21 | **Disposition:** CAA Date: 04/06/21 |
| **Judicial Status:** | **Occurred between:** 11:54:18 04/06/21 |
| **Misc Entry:** 149951 | **and:** 11:54:18 04/06/21 |

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

*Deputy Report for Incident 21-008111*                              *Page 2 of 29*

**Modus Operandi:**              **Description :**              **Method :**

**Involvements**

| Date | Type | Description | Relationship |
|------|------|-------------|--------------|

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

## Narrative

MONTROSE POLICE DEPARTMENT CASE REPORT


CASE NUMBER: 21-008111

NATURE OF
INCIDENT/OFFENSE: Sex Offense

INCIDENT/OFFENSE
LOCATION: 1140 North Grand Avenue, Suite 100, Montrose, CO 81401

CHARGES:

Unlawful sexual contact 18-3-404(1)(a) [1M]

Criminal attempt 18-2-101(1)
Unlawful sexual contact 18-3-404(1)(a) [2M]

Harassment 18-9-111(1)(a) [3M]

Harassment 18-9-111(1)(a) [3M]

DATE AND TIME
REPORTED: 04/06/2021 at 1154 hours

OFFICER: Patrick Demers

---

NARRATIVE:

On 04/04/2021, at approximately 0303 hours, Communication Supervisor AMY WARDLAW (DOB 07/08/1974), an employee of the Western Colorado Regional Dispatch Center ("WestCO"), located at 1140 North Grand Avenue, Suite 100, in the City and County of Montrose, State of Colorado, wrote an email to notify her supervisor, Executive Director MANDY STOLLSTEIMER (DOB 06/26/1975), of an incident involving Olathe Police Department Detective DAVID PEARSON (DOB 12/05/1984), which she reported to have occurred while at work during the early morning hours of that day.

The email reads, "Mandy, I wanted to let you know about an incident that occurred tonight / this morning. Officer Pearson came in with his trainee to let the new officer see dispatch and meet those of us who have not met him. While the new officer was on the main floor David came into the supervisors office. When he came in he gave me a side hug which was odd but I continued talking with him. He was talking to me about how he would go about getting it approved to be like MCSO and use CRO and UTL to close out their cards. I was telling him that he would need to have Roger discuss it with you first. I was showing him on spillman how and where we input that info when he made a move to attempt to wrap both arms around me from behind which put both of his hands at my breast level. Nathan was standing up at position 2 and saw it happening. I do not remember exactly what I said but it was loud enough and sounded distressed enough that all of dispatch knew something had happened. Nathen came into the office in an athortive [sic] way and told David to leave now and he was not welcome back ever since he had been warned in the past about jokes and pictures and actions. I am sure you will be hearing from Roger [Olathe Police Chief ROGELIO "ROGER" PACHECO (DOB 09/16/19610] or Georgette [Olathe Police Department Sergeant GEORGETTE BLACK (DOB 12/07/1972)] or David in regards to the incident.

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

*Deputy Report for Incident 21-008111*                                        *Page 4 of 29*

I am sure you will want to speak to me about it at some point. I just wanted to give you a heads up. Amy"

On 04/05/20201, AMY met with MANDY and City of Montrose Human Resources Director PHYLLIS "TERRI" WILCOX (DOB 12/13/1961) to discuss the incident. In an email sent by MANDY to Montrose Police Department DETECTIVE SERGEANT BERRY, dated April 6, 2021 at 9:57 AM, MANDY summarized the meeting by saying "In a discussion with Amy and Terri Wilcox, City of Montrose HR Director, Amy did tell us that her breasts were touched by Officer Pearson during the incident. WestCO ECS Nathan Compton (DOB 02/21/1972], asked/demanded Officer Pearson to leave the center and advised he was no longer welcome (every) at WestCO. Among other details, Amy told us that Officer Pearson left WestCO and attempted to text her at 0232 on her personal phone as well as call her on her personal cell phone. He also called dispatch at 0405 hours and attempted to speak to her. She did not speak to him". MANDY additionally indicated that ROLAND HUTSON (DOB 07/05/1976), ███████ ███████ (██████████████ and BROCK GATT (DOB 06/26/1996) were additional WestCO staff members working at the time of the incident. The email chain referred to has been included in the case file for reference.

On 04/06/2021, I was advised by DETECTIVE SERGEANT BERRY that AMY wished to proceed forward with a criminal investigation into what had been alleged. On 04/06/2021, at approximately 1554 hours, DETECTIVE SERGEANT BERRY and I conversed with AMY within a recorded interview room within the Montrose Police Department. The associated recording has been uploaded to the case file for reference. The following is an administrative summary of that conversation which is not intended to be exhaustive in nature.

Shortly after the interview began, AMY became emotional as she recounted the events. In an effort to reduce AMY's discomfort, DETECTIVE SERGEANT BERRY elected to run the interview, while I monitored it remotely. AMY explained that she felt compelled to come forward to file a report, stating "it has to get done, because I feel like I'm not the only one it's happened to". AMY expressed a sense of overarching collective concern, stating "any time he [DAVID] comes into our center, you can just feel all the females on edge". AMY was aware that this collective concern led NATHAN to confront DAVID on one prior occasion; "NATHAN stopped him at the door [to the dispatch center] and said no touching anyone". "NATHAN just stopped him at the door and said 'hey, there is going to be no touching when you come in the center. You can come in, just no touching". AMY relayed, "that's part of what drove me [to come forward]. If he is doing this to me, what else is he doing?" AMY additionally expressed apprehension in coming forward, due to DAVID's position as a peace officer and explained "I don't want to be that pariah that blew the whistle"; "I have a feeling that people are worried to say anything because he is one of our agencies officers. That's why I was worried to say anything".

AMY began to recount the events of the early morning hours of 04/04/2021, by explaining that she was in the Supervisor's Office with the office door cracked open, working on recording requests, when she heard a knock on the main door to dispatch. AMY recalled NATHAN shutting the door to the Supervisor's Office, effectively locking it from the inside and subsequently opening the main door. AMY explained that DAVID often comes in to the center and tells "horrible" and "inappropriate" jokes. AMY reflected, "we've told him we don't want to hear it" but "he will go around the whole room until someone listens".

AMY recalled that DAVID and his trainee, Olathe Police Department Officer JAMES FOGG (DOB 05/07/1991), entered dispatch at approximately "2ish". AMY relayed

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

her belief that there may be a surveillance camera in the parking lot but stated that there are no surveillance cameras present inside the center. AMY recalled that ROLAND had been serving as the dispatcher for the Montrose County Sheriff's Office and the Olathe Police Department on their shared radio channel. AMY indicated that she had been unaware if DAVID had notified dispatch of his intent to visit the center prior to his arrival. AMY believed that DAVID "came to introduce his trainee to dispatch and to us". AMY explained that DAVID had knowledge of the gate code to access a perimeter security fence, which allowed him access to the door to dispatch. AMY seemed to express a sense of surprise at DAVID's presence, explaining "ROLAND told me that ROGER had told him [DAVID] that he wasn't even supposed to be in dispatch". AMY estimated that it had been a matter of months, perhaps two or three, since she had last seen DAVID in dispatch.

AMY stated that DAVID "tapped on my window [ window to the Supervisor's Office] and said 'I need to talk to you". AMY noted that DAVID was alone as JAMES was conversing with ROLAND. AMY explained her thought process in deciding to open the door by stating, "I'm a supervisor and he is one of our user agencies. I'm like well if its work, I'll open the door and I talked to him". AMY recalled standing up and opening the door to her office. AMY recalled that her office door was open, as were the blinds, during her interaction with DAVID. AMY recalled that DAVID entered her office, asking how she was doing and giving her a "side hug", after which she returned to sitting at her desk. AMY explained that a side hug is not normal for their relationship and made her feel "weird", adding "he is a little more comfortable than I". AMY characterized her relationship with DAVID as typical of other professional relationships. AMY explained "I keep my knees and my feet tucked under my desk any time he comes in, because he has a habit of grabbing, like he'll try to grab your knee to make you jump". AMY recalled that DAVID began enquiring about marital problems with her husband, stating "I heard from GEORGETTE that you're having some problems with DAVE [husband]". AMY relayed that she responded with a statement to the effect of "it is what it is. We will figure it out. DAVE is DAVE". AMY thought it was odd of DAVID to ask about marital issues and. AMY explained that DAVID appeared to begin to leave to go back to the dispatch floor but then asked "how can we close out our calls like the S.O. [Montrose County Sheriff's Office] does?" AMY relayed that she began to demonstrate the process to DAVID, utilizing her desktop computer while seated at her desk.

AMY recalled being "mid-sentence", stating "ROGER has to go to MANDY...". AMY explained, "I'm aware of him [DAVID] moving" and believing he was "just coming to look at Spillman", she "scooted a little" to allow him to see the computer screen. AMY recalled both of her hands being at desk level, typing on the keyboard as she sat at her desk. AMY became emotional as she recounted, "all of a sudden, it was like an octopus had come over the back of my chair", "all of a sudden there are two arms, hands around me and there's hands on my breasts". AMY explained that she felt a flat hand press on both of her breasts, and reenacted what she felt. AMY relayed, "I must have looked terrified. I know I panicked because I've had crap happen to me in my life". AMY recalled that as she felt "pressure" on her breasts, she recalled her body shrinking away from DAVID's touch. AMY recalled beginning to elbow DAVID away with her left arm. AMY surmised, "I must have said something because ███ said 'I heard you in distress'. I heard your voice and I heard you say his name and I heard you in distress. I don't remember what I said". AMY recounted, "all I remember is looking up and NATHAN was coming off of his console and he was slamming the office door and he was this close to PEARSON's face and he was like 'you've been warned about touching people, you need to get the fuck out". AMY additionally

08/24/21

**EXHIBIT A**

**COPY**                    **SEXUAL ASSAULT**

recalled NATHAN using the words "saving face" in reference to confronting DAVID outside of his trainee's earshot. AMY explained, "at that point, I was in my chair, had pulled my feet up in a fetal position and had my head down on the desk, just trying not to even be in the room".

AMY relayed the emotional toll that she had sustained as a result of the incident by explaining "I have a ton of backpacks, so when that sort of crap happens to me I just, I blank it". AMY added, "I tried to put it in a box and to shove it away and be like 'it's fine, I'm okay'. And I thought I was fine and okay and then I walked back in the office and I was not". AMY stated, "I can't even walk in the [supervisor's] office right now"; "I don't want to be in a corner, where anything could happen to me". AMY recalled that following the incident she sat on the dispatch floor instead, explaining "its where I feel safe". AMY explained that the incident "threw me back years to trauma I thought I had dealt with". AMY was provided with a Victim's Rights Pamphlet and spoke with VICTIM ADVOCATE BAINBRIDGE.

In the hours remaining in her shift following the incident, AMY relayed that DAVID attempted to contact her several times via several different methods. AMY indicated that it was relatively uncommon for DAVID to communicate with her via her personal cell phone. AMY checked her cell phone to confirm receiving a text message from DAVID's cell phone, stored as a contact entitled "David Olathe PD Officer", which was timestamped "2:32 am". AMY added that she received a phone call on her cell phone, placed by DAVID's cell phone, which was time stamped "4:05am". AMY relayed that DAVID's text and call went unanswered. AMY provided screenshots of the relevant information from her cell phone to DETECTIVE SERGEANT BERRY and these have been uploaded to the case file for reference. In addition, AMY completed a diagram, which has been included in the case file, illustrating the layout of the dispatch center and the location of persons present during the incident. AMY relayed that she was additionally aware that DAVID had placed a phone call to dispatch, in the hours immediately following the incident, in an effort to speak with her. AMY again indicated that this call had gone unanswered by her. Additionally, in the hours following the incident, AMY recalled talking with ▮▮▮▮ AMY further recalled ▮▮▮▮ informing her that DAVID had touched her "mid-chest, up under her chest", while at work and had additionally touched WestCO staff member ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ inappropriately, also while at work.

AMY referenced what she perceived to be a long standing pattern of troubling and inappropriate behavior on DAVID's behalf. AMY relayed that she has worked for the dispatch center for the preceding five years and estimated that DAVID had worked for the Olathe Police Department for the preceding three years. During that time AMY recalled several specific incidents of unwanted touching involving DAVID. "I know, for me [AMY], I have told him [DAVID] 'that's not appropriate and that's not okay' at least a half dozen times". AMY described DAVID as being "very touchy" and indicated that this incident had not been the first to make her feel uncomfortable with DAVID. AMY indicated "I have let so much of it roll". AMY stated, "I'm just going to preface it with he [DAVID] has been warned before about touching dispatchers". AMY added, "none of the other officers come in and try to get up close and personal with everyone and doesn't listen when you tell them to stop. Everybody else is professional and respectful. We all cut up and made crude jokes with the industry we work in but nobody ever keeps it going if somebody says something". AMY remarked that DAVID "constantly likes to try to grab girl's knees, even if you're like stop it". AMY reflected, "I don't understand how the man [DAVID] thinks. I almost think that he thinks like a little boy".

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

AMY recalled several prior specific incidents of unwanted and uncomfortable touching involving DAVID. AMY felt as though DAVID's visits to the dispatch center often coincided with her scheduled shifts. "I think he [DAVID] has come into the center one time when I wasn't there". AMY recalled a specific incident which she alleged to have occurred when WestCO was located within the Montrose Police Department. AMY stated, "he [DAVID] grabbed my knee when we [WestCO] were here [Montrose Police Department] and GEORGETTE [BLACK] told him it wasn't okay". AMY recalled that GEORGETTE had been present when the incident occurred and had been working for both WestCO and the Olathe Police Department during that period of time. AMY further recalled that the incident occurred just prior to WestCO's relocation to the current center. AMY relayed that DAVID came in to the dispatch area and was "joking around" with GEORGETTE. AMY further recalled that DAVID approached her, greeted her and grabbed her knee, to which she replied "what the hell?" AMY recalled DAVID making a statement to the effect of "just trying to make you jump". AMY stated, "when he [DAVID] left [dispatch], I looked at GEORGETTE and she is like 'no, that's not appropriate, I'll deal with it on my side". AMY additionally recalled a specific incident involving DAVID, occurring approximately six months prior in "county dispatch", during which she had been at the "position one" console. AMY relayed that it had been similar in nature to the current incident as it involved DAVID looking at a CCIC entry on her computer. AMY relayed that as they looked at the computer screen together, DAVID "reached and glanced", "pointing at something" and "brushing" in a "side glancing" manner against her breast. AMY recalled that she had dismissed that contact as accidental in nature.

On 04/06/2021, at approximately 1802 hours, I met with ROLAND HUTSON (DOB 07/05/1976) within a recorded interview room located at the Montrose Police Department. The associated recording has been uploaded to the case file for reference. The following is an administrative summary of our conversation which is not intended to be exhaustive. In addition to his statements during the interview itself, ROLAND submitted a written statement, which has been incorporated in the case file for reference. ROLAND further completed a diagram of the dispatch center and the location of staff during the incident. ROLAND's diagram has been uploaded to the case file for reference.

ROLAND explained that he has served as a "Telecommunicator" for WestCO for the past year and a half, has also served on the Olathe Town Board for the past five years and was elected Mayor of Olathe last year. During the early morning hours of 04/04/2021, ROLAND recalled DAVID arriving at the dispatch center with a trainee, JAMES. ROLAND recalled that NATHAN had let DAVID and JAMES in after knocking on the dispatch center door. ROLAND was asked to review a review a "radio log" for the radio call sign "Olathe 5" [JAMES], which reflected a "VIA Visit" entry, time stamped 05:56:06 04/04/21. ROLAND explained that he made this radio log entry to reflect JAMES and DAVID's presence in dispatch and to avoid having to "status" them. ROLAND was not sure how long JAMES and DAVID had been present at dispatch before he made the entry. The radio log has been added to the case file for reference. ROLAND recalled that JAMES had previously oriented to the dispatch center and staff during a visit facilitated by SERGEANT (GEORGETTE) BLACK. ROLAND recounted his observations of DAVID's behavior upon entering the center; "when PEARSON came in, he went straight to the supervisor window and didn't acknowledge anybody else on the dispatch floor, which is weird and I've known him quite a while because of the Olathe connection". ROLAND recalled observing DAVID as he knocked on the window of AMY's office and motioned to AMY as if he wanted to enter and speak to her. ROLAND recalled that JAMES simultaneously approached him and began taking about a call that he and

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

DAVID had handled that he had questions about.

ROLAND recalled sitting at his console and relayed that NATHAN's elevated console, and NATHAN himself, blocked his view of the supervisor's office, as ROLAND remarked that NATHAN is tall in stature.  ROLAND estimated that DAVID had been in AMY's office for "a few minutes", when he observed NATHAN walk straight into AMY's office and "slam" the door shut behind him.  ROLAND maintained that he was unable to hear any ensuing discourse between the involved parties while in the office.  Later in the interview ROLAND, when asked directly, remarked "I could see, PEARSON is pretty tall too and I could see he went over where AMY was sitting at her computer and I saw that he leaned down by her, behind her but I don't know any more than that".  Of note, in ROLAND's witness statement he indicated "I could not see, or hear what transpired in the office".

ROLAND recalled, "as soon as he [NATHAN] got up and when that office door slammed, I knew that PEARSON had probably touched her inappropriately or had tried to hug her, which she has mentioned in the past makes her very uncomfortable".  I asked ROLAND why he had come to this conclusion.  ROLAND explained, "other dispatchers, female dispatchers, have made complaints about him doing the same thing.  Poking them in the ribs or trying to jokingly touch their knee".  ROLAND added, "I was there for one of them".  ROLAND recalled, "he [DAVID] was joking around with another female dispatcher [████] and he poked her in the ribs and she told me later it just creeped her out".  When he made this observation, ROLAND recalled being present at console five, while [████] was present at console number four.  ROLAND could not recall if [████] was seated or standing at the console.  ROLAND recalled that DAVID appeared to be "making a joke and just trying to jab her in the ribs".  ROLAND recalled observing [████] as she "pulled down into her shell" in response to DAVID's touch.  ROLAND remarked, "every time since then, whenever he [DAVID] comes in, she [████] just turns around and faces her computer screen and just hunkers down and tries to ignore him".  According to ROLAND, he recalled the incident involving [████] occurring in the dispatch room "last summer or last fall".  ROLAND remarked, "I did speak with OFFICER PEARSON after that [████] incident] and asked him 'please don't touch anybody".  ROLAND indicated that he was aware that DAVID had additionally been told by others not to touch dispatch staff; "I know he has been [told] by his Sergeant, GEORGETTE BLACK".  "GEORGETTE BLACK has told me so";"that she has specifically told him hands off.  If you visit dispatch, you do not touch any of the dispatchers there".

Following the incident with AMY in the Supervisor's Office, ROLAND observed DAVID emerge and ask JAMES if he was ready to go and left.  ROLAND recalled speaking with NATHAN following the incident.  ROLAND relayed that NATHAN told him "he did not physically touch DAVID but did 'poke on his badge' and told him he is not welcome and to leave and he is not to touch anybody ever again".  ROLAND additionally recalled speaking with AMY, who told him "DAVID came up behind her while she was trying to show him something on CAD and reached his arms around her".  ROLAND added, "I didn't want any more details than that.  That was enough for me".  ROLAND indicated that DAVID called WestCO approximately fifteen minutes before the end of AMY's shift, in an effort to speak with her.  ROLAND recalled answering DAVID's phone call to WestCO.  ROLAND recalled that DAVID seemed to have more follow up questions about CAD entry, but ROLAND "was not going to let him [DAVID] talk to her [AMY]".  ROLAND additionally recalled hearing from AMY that DAVID had tried calling and text messaging her personal cell phone following the incident.

Following the incident, ROLAND recalled speaking with CHIEF PACHECO on

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

04/05/2021, relaying "I'm not giving him any details but as Mayor I would like you [CHIEF PACHECO] to relay to him [DAVID] that he is not welcome there [WestCo]". ROLAND relayed that CHIEF PACHECO was "was very upset. He said 'he should not be leaving Olathe to visit dispatch period'. He said 'as Chief and my policy is dispatchers are not your friends, those are a professional relationship and he has no business even visiting". ROLAND stated that he did not file a formal complaint with the Olathe Police Department but indicated that he was aware that a formal complaint had been filed regarding the matter. ROLAND expressed his own concern, stating "my biggest, one of my big concerns is if he is pulling this where he has been told not to do so, what does that open the Town of Olathe up to for liability on female drivers on traffic stops. What's he doing when he has no supervision around? It scares me to death".

On 04/06/2021, at approximately 1850 hours, I met with ██████ ██████ ██ ██████████ within a recorded interview room located at the Montrose Police Department. The associated recording has been uploaded to the case file for reference. The following is an administrative summary of our conversation which is not intended to be exhaustive.

During the early morning hours of 04/04/2021, ██████ recalled that AMY had been present in the Supervisor's Office, when DAVID and his trainee arrived at dispatch. ██████ explained, "generally we are all kind of all on high alert when he [DAVID] comes in". ██████ further explained, "we know that he has had a history of making people feel uncomfortable". ██████ recalled, "its been conversation in there [dispatch] before how he tries to kind of like grope certain people in there". ██████ relayed that DAVID "tends to gravitate toward the female workers". ██████ recalled that DAVID "had been asked previously not to touch the females in there [dispatch]". ██████ stated, "I know he has been told by his superior Olathe 2 [SERGEANT BLACK], not to touch people in dispatch. He's been told by ROLAND not to touch people in dispatch". ██████ added, "a few nights before he had been asked by NATHAN not to touch anyone in there". ██████ believed NATHAN had warned DAVID, "if you touch anyone in here, you have to leave". ██████ was aware that AMY's door was intentionally shut before DAVID walked in and aware that DAVID had called in to see if anyone wanted anything from Maverick prior to his arrival.

██████ recalled that DAVID's trainee spoke with ROLAND at his console, while DAVID entered AMY's office. ██████ further recalled, "at one point I did hear AMY sound very uncomfortable, saying 'DAVE". ██████ recalled hearing AMY say his name "two or three times" in a distressed tone. ██████ explained that she had worked with AMY long enough to sense the distress present in her voice. ██████ went on to explain that AMY commonly speaks in a lower tone, does not often speak loudly. ██████ described AMY's voice on this occasion as "very high pitched and loud", further recalling that she could hear AMY's voice through her headset and radio traffic on speakers. ██████ noted that AMY's voice sounded as though "she was pulling back". ██████ explained, "AMY and I specifically, like I said, her and I talk a lot, her and I have shared past experiences with each other where we've been put in uncomfortable positions by men. Positions that make us uncomfortable around people who don't stop when they are asked to". ██████ relayed that she cannot commonly hear talking in the Supervisor's Office when seated at her console, with the exception of something elevated in volume like laughter for example. ██████ relayed that she had not seen any of the interaction between DAVID and AMY as her console is not oriented in that direction.

██████ recalled seeing NATHAN enter AMY's office and close the door loudly,

08/24/21

**EXHIBIT A**

**COPY**       **SEXUAL ASSAULT**



attracting everyone's attention. ▮ recalled that NATHAN and ROLAND seemed to respond at the same time. ▮ explained that she could not hear what was being said in AMY's office after NATHAN closed the door. ▮ recalled that DAVID left the office first and departed dispatch. KYLE recalled, "when AMY came out [of the office], she said that PEARSON had gone to hug around her and basically from the gesture she was making it looked like he had tried to put his arms around where her chest is". "With AMY, its been reoccurring that he has been trying to hug her or grab her knees. He has been asked multiple times to stop".

▮ recalled several specific instances when she herself was touched by DAVID in ways that made her feel uncomfortable. ▮ recalled DAVID "rubbing her shoulders", while asking her to do work for him. ▮ remembered "turtling" down into her chair in response to DAVID rubbing her shoulders. ▮ recalled asking DAVID to stop and he complied. ▮ remembered DAVID grabbing her sides three times in one shift while she was still in training (prior to October of last year). ▮ stated that she told DAVID "no" and "don't touch my sides", moving away from him as she did so. ▮ recalled DAVID replying with a comment to the effect of "just keeping you awake" in response. ▮ relayed that DAVID kept touching her sides twice more during the same shift, despite being told no after the first time. ▮ recalled that after the third time she sat down in chair to avoid being grabbed on the sides.

▮ additionally recalled a specific instance during which DAVID "poked [her] right beneath [her] breasts, on [her] stomach". ▮ described the area as being "two fingers below the bra line". ▮ recalled that ROLAND had been present and had witnessed the incident. ▮ described the touch as being "completely unprompted, I hadn't been talking to him". ▮ recalled that she had been standing at her console, facing away from everyone, turned around to look at ROLAND. ▮ relayed that DAVID was sitting close to her console, sitting over the plastic floor mats at her desk and "just reached over and poked me". ▮ relayed that she was "pretty uncomfortable after that point" and immediately confronted DAVID, exclaiming "why would you do that?" pretty loudly in response to being poked. ▮ recalled that everyone in dispatch turned around in response. ▮ felt "the guys in the room gave him a look like what are you doing?" ▮ recalled that ROLAND spoke with DAVID following that incident, asking him not to touch anyone.

▮ added that she was aware that DAVID had grabbed fellow WestCO staff member ▮ sides while at work. ▮ estimated that this occurred once she was out of training, after October of last year. ▮ relayed that ▮ responded to DAVID's grab by telling him "very loudly told him not to". ▮ believed DAVID stopped touching ▮ once he became aware that she was dating another dispatcher and felt that DAVID had stopped touching her after becoming aware that she was dating a deputy. ▮ relayed that the incidents that she was referring to involving DAVID touching her and other staff members occurred within the past year. ▮ was provided with a Victim's Rights Pamphlet and offered the services of a Victim's Advocate. ▮ additionally completed a diagram of the dispatch area, which has been included in the case file for reference.

On 04/07/2021, at approximately 1257 hours, I met with JAMES FOGG (DOB 05/07/1991) within a recorded interview room within the Montrose Police Department. The following is an administrative summary of our conversation which is not intended to be exhaustive.

**EXHIBIT A**

**COPY**                    **SEXUAL ASSAULT**

JAMES explained that he has been an Olathe Police Department Officer since 02/18/2021 and was assigned to DETECTIVE PEARSON for training since the last part of March. JAMES explained that the two worked a shift together during the late evening hours of 04/03/2021 and into the early morning hours of 04/04/2021 during which they utilized JAMES' radio call sign. During the shift, JAMES recalled responding to a citizen assist call which involved an elderly female party who required assistance in using the bathroom. JAMES relayed that he "had to help clean up the old lady after she was done". JAMES expressed concern with the way he was directed to handle the call by DAVID, "to be clear, I tried to call fire out to there but DETECTIVE PEARSON was like 'nah we got it'. JAMES underscored his disagreement, stating "I thought that was beyond my scope of help". JAMES relayed, "even before we arrived, I was like DAVE, this is an elderly female, we need to have fire present. There is a female on shift". JAMES recalled being directed by DAVID to assist the female party, despite his expressed apprehension and reservations. JAMES recalled DAVID stating "my partner will help you do that". JAMES recalled assisting the female party out of bed and assisting her in removing her "pull ups". JAMES relayed that the female party had a bowel movement and DAVID retrieved a new pad. JAMES further recalled helping the female party begin to put on her "pull up" and stand her up, when she bent over and stated "I know but I need some help". JAMES recalled, "I'm sitting there with this toilet paper in my hand, gloved up, and I look at DAVE and I'm like 'dude, I really don't want to do this'. JAMES stated "I wiped her". JAMES relayed, "quite frankly, I was upset with DETECTIVE PEARSON about that one because this was his idea to help out this elderly lady, when I plead let's get fire on here and it was his idea and I dealt with doing something that I absolutely thought was inappropriate and I didn't have any business doing as a law enforcement officer and as a male". JAMES explained that his body camera was activated and recording during this case and he believed DAVID's body camera was not.

JAMES recalled making a traffic stop on Highway 50 prior to heading to Maverick (1140 North Townsend Avenue) in Montrose, where DAVID called dispatch to offer to pick up snacks or drinks for them. JAMES recalled that dispatch informed DAVID that they did not want anything. JAMES explained that he had been to dispatch previously for orientation and had met most of the staff previously. JAMES believed that he and DAVID were going to dispatch to speak with ROLAND regarding their actions on the citizen assist call involving the elderly female party. JAMES recalled that DAVID knew the access code to the perimeter security fence. Once inside, JAMES recalled that DAVID went "directly" to AMY's office and appeared to be standing behind her, as she was seated at her desk, approximately three feet. JAMES explained that he could not hear what was transpiring in AMY's office. JAMES relayed that he would "glimpse occasionally" in DAVID's direction but recalled he had been busy speaking with ROLAND. JAMES explained that he knows ROLAND from the Olathe Fire Department and was discussing the citizen assist call with him. JAMES did not recall NATHAN's console being in an elevated position and remembered the blinds of AMY's office as being down but relayed he could see through the blinds. JAMES recalled noting that NATHAN was "zoned in, keeping an eye on DAVE; he was watching DAVE". JAMES felt that NATHAN had been watching DAVID closely due to prior incidents.

JAMES explained that something appeared to "agitate" NATHAN and he entered AMY's office, shutting the door loudly. JAMES relayed an understanding that AMY was going to show DAVID something on a Facebook / social media account and that is when DAVID leaned in and NATHAN intervened. JAMES recalled that the loud noise "got all of our attention". JAMES recalled that "NATE seemed pretty upset". JAMES recalled observing NATHAN standing within two feet of DAVID. JAMES

08/24/21

**EXHIBIT A**

**COPY**                    **SEXUAL ASSAULT**

recalled DAVID looking "pretty defeated" upon exiting AMY's office.  JAMES recalled asking DAVID "what that was all about" as the two traveled back to Olathe after leaving dispatch.  JAMES relayed, "he [DAVID] said NATE came in and said 'I told you not to be touching people.  Next time you touch people you're not going to be allowed back in dispatch and I'll take your badge and your career away from you".  JAMES added that DAVID said "he told me once before not to touch people".  JAMES explained that he initially interpreted NATHAN's comments to DAVID within a COVID-19 context and thought that NATHAN had been discouraging contact in an effort to reduce viral transmission.  JAMES recalled DAVID stating, "I didn't even touch anybody, I leaned in".  JAMES indicated that he was aware DAVID tried to reach out to AMY to apologize, via text message as well as to ROLAND, expressing the sentiment that he hoped he had not offended anyone.  JAMES recalled speaking with GEORGETTE, as part of internal affairs investigation and was concerned because he shook ROLAND's hand.  It was at that time that JAMES was told by SERGEANT BLACK, "no that was professional, what we are talking about is inappropriate".

JAMES expressed concern, characterizing DAVID's story as evolving and inconsistent.  The following day, JAMES recalled DAVID stating, "I'm still kind of concerned about that" and "I'm seriously nervous, I'm worried about this".  JAMES recalled, "he [DAVID] said that NATE, instead of saying next time you do this, it was I am going to get your badge, I am going to get your career.  You are no longer allowed into dispatch".  JAMES completed a diagram of dispatch, which has been included in the case file for reference.

On 04/07/2021, at approximately 1512 hours, I met with NATHAN COMPTON (DOB 02/21/1972) within a recorded interview room located at the Montrose Police Department.  The associated recording has been uploaded to the case file for reference.  The following is an administrative summary which is not intended to be exhaustive.  In addition to our conversation, NATHAN submitted a written statement, which has additionally been uploaded to the case file.  NATHAN additionally completed a diagram of the dispatch area and the location of the parties present.

NATHAN explained that during the "last few months or so" he has been aware of "several complaints" about DAVID "touching" or "hugging" people.  NATHAN characterized the behavior as "inappropriate but never really out of hand".  NATHAN recalled a specific instance when DAVID approached him from behind and put his hands on his shoulders, prompting NATHAN to shrug it off, as it didn't feel good.  NATHAN remarked, "I've seen him [DAVID] hug quite frankly every female in the room at one point in time or another".  NATHAN relayed that shared concern prompted him to take action, "we discussed things, the other WestCo employees and I.  And I came to the conclusion a couple months ago that I was going to have a conversation with DAVE.  And so one night he was coming into the center and I stopped him at the door and I said 'listen DAVE, if you come in here, under no circumstances will you touch anyone.  Do you understand that?  Kind of semi-friendly, kind of semi-legitimate warning.  And he gave an affirmative grunt, so he came on in and he didn't touch anybody".  NATHAN recalled that this admonishment was given to DAVID "a month or two ago".  NATHAN stated, "there are at least three females that work there [WestCO] that are basically terrified of him coming in because of the inappropriate touching".  NATHAN identified those female parties as AMY, ███ and ███.  NATHAN recalled seeing DAVID hug ███ and observed that "she did not appreciate it".  NATHAN relayed that ███ is terrified of DAVID and noted that she would "totally freak out" if she knew DAVID was coming to dispatch.  NATHAN remarked, "any time he would touch people, they would be upset about it".  NATHAN relayed

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

that he was "dismayed at DAVID's behavior, especially as a uniformed officer". NATHAN further remarked, "it appeared inappropriate and whenever he would leave after the 'huggings' would happen, people would say 'I don't like that". NATHAN added "one night when he hugged all of them, nobody reciprocated and everybody got a slightly shocked look on their face". NATHAN expressed his belief that a couple supervisors were aware of the collective staff concern regarding DAVID was not aware of him ever being formally banned from the center. NATHAN mentioned, "I do know that I was told by someone that works at WestCo that his immediate supervisor with the Olathe Police Department had also been told about the situations and had a conversation with him". NATHAN clarified that would be SERGEANT BLACK, and he was not aware of any ramifications or corrective actions that were imparted as a result.

When asked to recount the events of the early morning hours of 04/04/2021, NATHAN recalled DAVID calling in on the phone at approximately 0200 hours and mentioned that he was going to the convenience store, asking if dispatch staff wanted anything. NATHAN recalled responding, "no, we are good", as he didn't want DAVID to come in to dispatch. NATHAN later recalled hearing a knock on the back door. NATHAN relayed that "everybody" has the code to the back gate. NATHAN recalled thinking "great, we all looked at each other going 'that's fucking DAVE'. We don't want to deal with this". NATHAN relayed that AMY was in the supervisor's office, she knew the door had been knocked on and "looked up with a great we have to deal with this look on her face". NATHAN recalled asking her if she wanted the door closed and AMY replying "yes". NATHAN explained that when the door to the Supervisor's Office closes, it locks. NATHAN recalled opening the dispatch door for DAVID and JAMES. NATHAN indicated that he did not believe they had any good reason to be present at dispatch. NATHAN explained that JAMES went to speak with ROLAND, who was seated in the console next to him, while DAVID "milled around" and saw AMY sitting in the office through the window. NATHAN observed DAVID get AMY's attention and it "appeared as though he might need something official", so AMY let him in to her office.

NATHAN recalled that he was standing at his elevated console. NATHAN explained that his position afforded him a "very, quite frankly, clear view between the screens of where the supervisors sit in their office, doing their work". NATHAN later took a photo, which has been included in the case file, which he stated is a fair and accurate representation of his field of view. NATHAN recalled that he had been dispatching for Montrose Police Department that night and that it had been busy. NATHAN relayed that as a result, he "didn't concentrate fully on what was going on in the office" but during a break in radio traffic did glanced into the office. NATHAN relayed that he observed AMY seated at her computer desk and DAVID "draped over the top of her, from behind", "hugging" and "holding" her. NATHAN did not recall hearing anything emanate from AMY's office. NATHAN observed that DAVID's hands "were in the area of the crooks of her elbows and I guess her chest". NATHAN was careful to qualify that he was unable to distinguish depth of field. NATHAN relayed that he "walked the eight feet to the office" and closed the door behind him. NATHAN recalled that the door "made a very loud noise, pretty sure everyone in the building was aware that something was happening". NATHAN relayed that DAVID "saw me coming and immediately stood up and backed away". NATHAN explained that he "confronted DAVE, putting myself between him and AMY without touching anyone". NATHAN explained "what prompted me to take action was the fact that he'd been warned previously not to touch anyone and here I see him leaning over her, grabbing her, hugging her in any manner whatsoever, whether or not it had been completely truly inappropriate contact or just any contact. I was done, he'd had his

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

warning". NATHAN observed that "AMY was curled up on her desk, trying to protect herself" as he confronted DAVID. NATHAN recalled speaking to DAVID, stating "How fucking stupid are you? You've been warned. You've been told. You've been told not to come in here and touch anyone. Get the fuck out right now". NATHAN recalled that DAVID just stood there looking at him and he had to reiterate himself several times. NATHAN recalled that he "forced him [DAVID] out with my personal bubble".

On 04/08/2021, at approximately 1017 hours, I met with ███████ ███████ within a recorded interview room located at the Montrose Police Department. The associated recording has been uploaded to the case file for reference. The following is an administrative summary of our conversation which is not intended to be exhaustive.

████████ reiterated the shared concern surrounding DAVID, expressed by WestCO staff and the heightened sense of vigilance that accompanied it; "if he [DAVID] comes in, he has to be watched really, really carefully". ██████ recalled an incident involving DAVID, which she estimated to have occurred between September and October of 2020, during which DAVID grabbed her by the sides. ██████ explained that she had been working a night shift and had been engaged in the process of taking a "cold theft call". ██████ relayed that she had been on the phone with the reporting party, when DAVID approached her from behind, as she stood at her elevated console and grabbed her sides. ██████ remembered that she "squeaked a little bit" in response, which "forced the caller to ask if she was okay". ██████ explained that DAVID's actions made her angry and she "jumped" in a "fight or flight" like response. ██████ explained, "at that point I was ready to probably get in a lot of trouble". ██████ added, "I don't do well with being touch unwelcomely". ██████ additionally recalled responding to DAVID's actions verbally; "I turned around and told him 'don't touch me like that. I don't appreciate it for one. Number two I was on the phone".

██████ indicated that she knew about ██████ being touched by DAVID "under her breasts, right in the middle". ██████ stated that she had been present when DAVID rubbed ██████ shoulders several times but indicated that she had not been present when DAVID had touched ██████ under her breasts. ██████ additionally expressed knowledge of AMY being touched inappropriately by DAVID "several times". ██████ explained that AMY told her about an incident during which DAVID placed his hand on her thigh and rubbed it and additionally came up behind her and rubbed her shoulders. ██████ explained that she had not been working the shift of the incident [04/04/2021] but had heard what had happened from BROCK GATT (DOB 06/26/1996).

██████ was very emotional as she recalled these events and explained that they brought back memories of things she had gone through as a kid. Provided with a Victim's Rights Pamphlet and spoke with VICTIM ADVOCATE BAINBRIDGE. ██████ relayed "it was something I was very concerned about". ██████ explained, "it wasn't until he touched me that I thought of letting higher people know". ██████ recalled that she had typed a memo to MANDY but had not sent it. ██████ further explained, "I thought it was being taken care of, that someone was letting MANDY know or HR know what was going on". ██████ stated, "when he came up and did that I was like okay maybe I should do it, go and tell someone. Because if it's not, it would be better if it was". ██████ concluded, "I know he was stopped at the door by NATHAN and told 'don't touch people, stay in your own bubble and if you don't then you're going to have to leave"; "I thought that was going to be the end of it, that he wouldn't go in anymore but after hearing Saturday's issue, I just kind of realized it's not going to stop".

**EXHIBIT A**

<span style="color:red">**COPY**</span>                    <span style="color:red">**SEXUAL ASSAULT**</span>

*Deputy Report for Incident 21-008111*                                      *Page 15 of 29*

On 04/08/2021, at approximately 1155 hours, DETECTIVE SERGEANT BERRY and I traveled to the Olathe Colorado Police Department, where we met with Police Chief ROGELIO PACHECO (DOB 09/16/1961). Our conversation was recorded via Axon Body Camera. The associated recording has been uploaded to the case file for reference. The following is an administrative summary of our conversation which is not intended to be exhaustive.

ROGELIO relayed that this was not the first time that he had received a complaint from dispatch staff regarding DAVID's behavior. ROGELIO could not recall the names of the dispatch staff involved in the prior complaint but relayed it came from a female employee and was conveyed by a male supervisor. ROGELIO recalled, "I was briefed on it" and "The Sergeant [GEORGETTE], I think she documented it". ROGELIO relayed that he had a "pretty direct conversation with him [DAVID]" in response to the prior complaint, during which "we told him that he is not allowed to go back. If he was for any reason have to go to dispatch, he was to notify of the reason for going". ROGELIO added that this restriction was additionally relayed to dispatch staff; "I think our Sergeant [GEORGETTE] told them that he was not to go over there. She talked to the supervisors and told them that he was not to go over there". ROGELIO advised that DAVID placed on administrative leave by the Olathe Police Department in response to the 04/04/2021 incident and he provided a copy of the letter informing DAVID of such, which has been added to the case file for reference. ROGELIO explained that he had learned of the 04/04/2021 incident in speaking with ROLAND.

When asked if ROGELIO was aware of any additional complaints of a similar nature regarding DAVID, ROGELIO mentioned, "I haven't heard of anything funny, however, you probably know a girl by the name of [TIERRA LEWIS (DOB 09/13/1992)], crackhead in town, um I wrote it down, there was a rumor that he was doing something with her. Of course he denied it, he denied it. Like on the side, off duty, on duty, I don't know because when we contacted her and it was not true and blah blah blah so". ROGELIO clarified, "there was a rumor that he was sleeping with her". ROGELIO additionally suggested that we speak with ▮▮▮▮▮ ▮▮▮▮▮▮▮ (▮▮▮▮▮▮▮▮▮ who was a former employee of the Olathe Police Department.

On 04/08/2021, at approximately 1356 hours, DETECTIVE SERGEANT BERRY and I met with Sergeant GEORGETTE BLACK (DOB 12/07/1972) at the Olathe Police Department. Our conversation was recorded via Axon Body Camera. The associated recording has been uploaded to the case file for reference. The following is an administrative summary which is not intended to be exhaustive.

GEORGETTE recalled that DAVID on the evening of 04/04/2021 to inform her that he "got thrown out of dispatch". GEORGETTE recalled that DAVID stated NATHAN "got up in his face" and told him to "get the hell out". GEORGETTE additionally remembered DAVID stating "all I did was just give AMY a hug". On 04/05/2020, GEORGETTE recalled being in training when ROGELIO called her to inform her that the mayor came in and made a complaint.

GEORGETTE recalled additional information regarding the prior complaint referenced by ROGELIO. GEORGETTE explained that before she was Sergeant, approximately two years ago, when GEORGE JACKSON was Chief of Police in Olathe and ROGELIO was a Sergeant, a complaint came in about DAVID "touching some of the dispatchers and that they did not feel comfortable"; "it was that he had touched one of the girls on the leg or something". GEORGETTE could not recall which dispatcher was involved. GEORGETTE recalled that ROGELIO stated "you are

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

going to be a Sergeant, you might as well go deal with it". GEORGETTE recalled asking ROGELIO if she should document the complaint in a Counseling Letter and was told "no, just talk with him". GEORGETTE recalled meeting with DAVID and telling him "don't go into dispatch unless you need to be there. Number two, do not touch anybody when you're in there". GEORGETTE additionally informed DAVID that his behavior was "not appropriate, can't happen". GEORGETTE advised DAVID, "if this happens again, you will definitely be written up and possibly loose your job. Do not let this happen again". GEORGETTE reiterated, "I've told him before and I've told him multiple times, don't be going into dispatch unless you really need to be there. Because our Town Manager is like 'hey too many of the officers are in Montrose too much. We need them back down here'. He seems to be my one that is down there a lot". GEORGETTE warned DAVID, "steer clear of it, if there is an issue, why would you go back to some place you're not, you know that there is an issue?" GEORGETTE additionally very clearly told DAVID, "don't be touchin' them. I straight up told him don't be touching people in there. There is a complaint, why would you do that? Don't do it".

GEORGETTE described a decline in DAVID's performance as an employee, relaying that he had "checked out". GEORGETTE added that DAVID was having difficulty completing detailed reports in a timely manner. GEORGETTE relayed her knowledge of a complaint that DAVID was having a sexual relationship with someone outside his current girlfriend in Kansas but explained that ROGELIO had "dealt with it", looking into the matter.

GEORGETTE recalled ▮▮▮ approaching her regarding an incident or incidents during which DAVID touched her, making her feel uncomfortable. GEORGETTE relayed "she goes 'he just makes me feel uncomfortable sometimes'. Because he touched the back of her arm. And I said 'okay'. And she goes, I said 'did you tell him not to do it? She goes 'yeah'. I said 'did he do it after?' She's like 'well no but not really but and I just don't feel comfortable'. I said 'fine, I just keep you as mine, my person". GEORGETTE explained that she assumed DAVID's role as ▮▮▮ training officer, ending his phase of training with ▮▮▮ early in response to ▮▮▮ expressed concern. GEORGETTE was asked if she had documented ▮▮▮ complaint in written form. GEORGETTE responded, "I gave him a counseling letter a while back on some of the stuff that he hadn't been getting done and extra stuff that we've had to do but nothing like on this part, no".

On 04/08/2021, at approximately 1446 hours, DETECTIVE SERGEANT BERRY and I traveled to 121 South West Seventh Street, Unit #4, in Olathe, Colorado, where we met with TIERRA LEWIS (DOB 09/13/1992). Our conversation was recorded via Axon Body Camera and has been uploaded to the case file for reference. The following is an administrative summary of our conversation which is not intended to be exhaustive.

TIERRA denied being in a relationship with DAVID but explained that DAVID patrolled the area of her home "a lot" because her neighbor was "a total tweeker". TIERRA relayed that no one from the Olathe Police Department had spoken with her relative to an investigation into a sexual relationship between she and DAVID. TIERRA mentioned that DAVID made "sexual comments" during the arrest of her friend, TARA WAGNER (DOB 05/02/1985). TIERRA recalled that DAVID made a statement to the effect of "if he had gotten her in handcuffs before me". TIERRA described DAVID as "friendly" and a "good guy", who "would give her kids stickers". TIERRA explained that she does not get along with TARA anymore following her [TIERRA's] arrest for driving under the influence (DUI). TIERRA described TARA as a "drama queen". TIERRA recalled mentioning the "sexual comments" made by DAVID to TARA while being arrested by GEORGETTE for DUI.

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

On 04/08/2021, at approximately 1533 hours, I met with BROCK GATT (DOB 06/26/1996) within a recorded interview room located at the Montrose Police Department.  The associated recording has been uploaded to the case file for reference.  The following is an administrative summary of our conversation which is not intended to be exhaustive.

BROCK recalled DAVID and JAMES arriving at dispatch at approximately 0040 hours on 04/04/2021.  BROCK explained that he was stationed at "console number three", which is referred to as the "guard station" and was watching television.  BROCK recalled ▓▓▓▓ being on the phone at the time of their arrival and further relayed that AMY's door was shut as she worked in the Supervisor's Office.  BROCK felt that AMY had intentionally closed her door because she knew DAVID was coming to dispatch.  BROCK recalled that JAMES walked to ROLAND's console and began conversing with him.  BROCK indicated that he had not witnessed DAVID and AMY's interaction in AMY's office but had heard about what was alleged to have transpired after the fact.  BROCK relayed that he believed the door to AMY's office had been closed as they interacted.

BROCK recalled hearing the door to AMY's office "slam", which he explained "startled everyone".  BROCK relayed that the blinds on the window of AMY's office had been open and he was able to see into the office after his attention had been drawn by the loud noise.  BROCK recalled seeing NATHAN present in the office, "getting in PEARSON's face" with "his [NATHAN's] finger in his [DAVID's] chest".  BROCK explained that DAVID's "facial expression dropped" and that "NATHAN was getting into him".  BROCK felt that NATHAN was not professional in the way he confronted DAVID.

BROCK explained that once AMY emerged from her office she conversed with several other staff members and he "caught bits and pieces" of the conversation.  BROCK relayed that DAVID gave AMY a side hug and may have put his hands on her shoulders.  BROCK explained that due to past events involving DAVID, the incident was not surprising to him.  BROCK described DAVID as "touchy feely".  BROCK felt that DAVID's general intent is good and friendly.  BROCK qualified that sentiment with the statement, "he [DAVID] tries to come across as far as personable nice, nothing to me where it seems like it should be like that but some of his actions say otherwise".  BROCK explained, "there have been a couple dispatchers that have spoken up to him so he has kind of backed off".  BROCK explained that he knew ▓▓▓▓ had asked DAVID to back off and knew ▓▓▓▓ had spoken up as well.  BROCK relayed that concerns regarding DAVID had not been relayed to MANDY or human resources.  BROCK stated, "I guess when I say that nobody has ever spoke up I'm kind of referring to AMY in a way, just because I have been hearing about this for the past couple years".  BROCK explained that he began his employment with WestCO in November of 2018 and roughly three months after that began to hear of incidents involving DAVID touching AMY's knee.  BROCK relayed that DAVID "seemed focused on AMY".

BROCK recounted an incident during which DAVID grabbed his sides as he stood at a console.  BROCK recalled that he had been working on the computer when DAVID grabbed him "right below the ribs" and "freaked him out".  BROCK recalled freezing in response and explained "it definitely felt uncomfortable".  BROCK remarked, "usually when I am talking with him I'm face to face with him.  I don't know if that's more so a mechanism of that".  BROCK could not recall the exact date of the incident but relayed that the incident occurred before the Olathe Police Department switched from the Montrose Police Department radio channel to the Montrose County Sheriff's Office channel.

08/24/21

**EXHIBIT A**

**COPY**      **SEXUAL ASSAULT**

*Deputy Report for Incident 21-008111*                                    *Page 18 of 29*



BROCK completed a diagram of the dispatch center and involved staff, which has been included in the case file.  BROCK was provided with a victims rights pamphlet and offered the services of a victim advocate.

On 04/08/2021, at approximately 1931 hours, I met with ████ ████ ████ ████ within a recorded interview room located at the Montrose Police Department.  The associated recording has been uploaded to the case file for reference.  The following is an administrative summary of our conversation which is not intended to be exhaustive.

████ recalled that DAVID had been her training officer for two and a half phases of the training process, which was ultimately "cut short" due to her request to GEORGETTE "because of his actions towards me".  ████ explained that she was employed by the Olathe Police Department for approximately two and a half to three months.  During her training with DAVID, ████ recalled several incidents that were troubling to her.  ████ mentioned an incident that occurred involving the transport of a male party to the Crisis Walk-in Center, located in Montrose.  ████ recalled that they had been waiting for food in a McDonald's "drive through" line, when DAVID flashed a flashlight in her eyes, prompting her to look away before again asking that she look at him.  ████ recalled that when she looked back at DAVID he extended his index and middle fingers, flicking his tongue between them before asking "do you like that?"  ████ recalled responding, "what?" and relayed that DAVID repeated "do you like that?"  ████ recalled this instance as the "first thing that occurred between him and I that really made me feel very uncomfortable".

████ additionally referenced a second incident involving DAVID which occurred while they were conducting traffic enforcement on Wortman Avenue in Olathe.  ████ stated, "that was the first time he had touched me".  ████ recalled being parked, facing south, watching the display on the radar unit of her patrol vehicle, when DAVID placed his hand on her right leg and "squeezed really hard".  ████ recalled that her hands had been on the steering wheel of the patrol vehicle and she reacted to DAVID's squeeze by lowering her right elbow.  ████ recalled stating "no, be good" and DAVID responding "I'm just playing".  ████ described how DAVID would "continuously" grab her leg just above the knee and squeeze "throughout training".  ████ described the frequency of these incidents by stating "not every shift but maybe every other or every third time I was with him".  ████ explained that she "kept her mouth shut" about a lot of DAVID's offensive behavior because DAVID was her training officer and she was simply trying to get through it.

████ explained, "the last time that he had done that, we were up on the highway.  We were running traffic again.  And um, and I wasn't watching and he had taken his hand and it wasn't up here [knee], it was here [placing her hand on her extreme upper thigh] like that, and he had squeezed but like it was on the inside of my thigh and then like he made a swiping motion up towards my crotch and I grabbed his hand and I pulled it off".  ████ relayed that DAVID's actions made her feel "very uncomfortable" and she froze at first before she "grabbed fingers and pulled them off".  ████ recalled feeling "shocked".  ████ relayed that this incident occurred within the first week of March, 2020.  ████ was emotional as she recounted these events.

████ relayed that she had a distinct memory of telling her husband, ████ ████ ████ in the backyard of their home what had happened and that he had strongly suggested that she notify GEORGETTE or ROGELIO.  ████ indicated that she was unable to recall if it was the following day or two days

08/24/21

**EXHIBIT A**

**COPY**           **SEXUAL ASSAULT**

later that she told GEORGETTE about what had happened. ▮▮▮ recalled arriving at the Olathe Police Department in plain clothes on a day off. ▮▮▮ stated that she asked to be removed from DAVID'S training because then, "[she] wouldn't have to ever been in a vehicle with him ever again". ▮▮▮ stated, "I said I didn't feel comfortable with him, especially the last time because he was so close to my crotch". ▮▮▮ recalled that in speaking with GEORGETTE about the incident "she mentioned that he will act that way toward dispatchers". ▮▮▮ relayed, "I just know that he had done it to dispatchers and that they were frustrated that he was doing it but I don't know of any consequences". ▮▮▮ additionally relayed that she was unaware of any consequences for DAVID as a result of her coming forward. ▮▮▮ explained that she had assumed DAVID would be "written up" in response, however "was never told anything after that". ▮▮▮ further explained "I figured it was just for privacy reasons".

On 04/09/2021, at approximately 1556 hours, I met with DAVID PEARSON (DOB 12/05/1984) within a recorded interview room located at the Montrose Police Department. The associated recording has been uploaded to the case file for reference. The following is an administrative summary of our conversation which is not intended to be exhaustive.

I advised DAVID that the door to the interview room was closed for our privacy and that he was free to leave. I further advised DAVID that the interview was part of a criminal investigation, separate from any existing internal affairs investigation and as such provided him with a Montrose Police Department Advisement and Waiver of Rights form, which DAVID initialed and signed. The form has been included in the case file for reference. I informed DAVID about the nature of the allegations, advising him it involved the events of the previous weekend and an allegation which AMY brought forward. I asked DAVID if that made sense and he advised it did. However, DAVID was very animated and seemed extremely surprised to learn that AMY alleged that he had touched her breasts.

I asked DAVID to describe his relationship with AMY and he described them as professional acquaintances, "no different than any of the other dispatchers". DAVID denied being attracted to AMY or having any feelings for her. DAVID relayed that he is currently "in a happy committed relationship with his girlfriend of four years, later identified as BRANDY HAMPTON (DOB 10/09/1984). I asked DAVID to help me understand his perspective on the events on the overnight hours of 04/03/2021 - 04/04/2021.

DAVID relayed that he had called dispatch to offer to bring snacks prior to arriving at dispatch. DAVID recalled that NATHAN had answered the phone and declined. DAVID explained that he and JAMES intended to visit dispatch to speak with ROLAND regarding a citizen assist call that they had responded to earlier in the evening. DAVID remarked, "it should have been and EMS call but we got sent to it". DAVID added, "we were trying to figure out why EMS wasn't paged and we were the only ones sent". DAVID explained that ROLAND was the dispatcher that evening and also works for the Olathe Fire Department. DAVID explained that he and JAMES had traveled to dispatch to get "clearance" from ROLAND regarding how they had handled the call. DAVID relayed that the female party, who was "pretty much bedridden" needed to use the bathroom. DAVID recalled receiving an instant message through Spillman from ROLAND to the effect of "EMS should have been dispatched". DAVID explained "by the time we got there, we had already had it handled so by the time EMS would have got there it would have been pointless".

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

DAVID remembered GEORGETTE speaking to him "a while back" about concerns expressed by dispatch.  DAVID relayed, "we were all told don't go to dispatch". DAVID additionally remembered that months ago, during the COVID-19 pandemic, NATHAN had warned him "don't touch anybody".  DAVID acknowledged touching dispatchers on the back and grabbing them by their knee and squeezing or jokingly "tickling" them.  DAVID explained that the intent of these actions was a joke or to scare them to keep them awake.  DAVID stated, "they've scared me, I've scared them".  DAVID remarked "I do it to my kids all the time".

DAVID recalled that AMY was in her office, NATHAN was at console number one and ROLAND was at the console behind NATHAN.  DAVID explained that he waived at AMY, through the window and recalled that she waived back.  DAVID relayed that AMY opened the door to the office and he walked in.  DAVID recalled that the door to AMY's office was open, as were the blinds.  DAVID recalled making general conversation with AMY, asking how she was doing and about vacation.  DAVID recalled, "I asked her how DAVE [ AMY's husband] was doing, because her husband is sick".  DAVID stated, "she [AMY] told me that DAVE has been accusing her of sleeping with TROY [ZIMMERMAN (DOB 04/05/1968)] and she might have mentioned NATHAN, I'm not one hundred percent sure so I'm not going to say that".  DAVID added, "she volunteered that.  I didn't ask that".  DAVID relayed that the conversation shifted to talking about Spillman and abbreviations used by the Montrose Police Department and Montrose County Sheriff's Office to close out calls for service.  DAVID explained that AMY was going to show him how the abbreviations worked in Spillman and began moving windows on programs on her computer.  DAVID recalled AMY stating, "damn it, damn it Dave".  DAVID explained "that's a thing that her and I have joked about in the dispatch room before". DAVID conveyed his belief that AMY was having difficulty manipulating her computer, leading to her verbally expressed frustration.  DAVID added "she laughed, I laughed".

DAVID physically reenacted standing behind AMY, situated behind her on her left side at an angle and demonstrated leaning forward.  It is important to note that as DAVID did so several times throughout the interview, he did so with his hands in a vertical cupped position.  DAVID stated, "my left hand touched that side of her arm".  As DAVID motioned with a flat hand on his left shoulder, he stated "I braced myself like that to look over".  DAVID stated that he believed he was touching AMY's shoulder or upper arm but was looking at her computer and assumed location of his left hand based on feel.  DAVID recalled that he felt a solid muscle sensation in left hand and felt nothing in right hand.  DAVID indicated that he did not notice AMY's reaction.

I asked DAVID to help me understand why he leaned over, even once standing directly behind AMY.  DAVID stated, "I guess to get a closer look because that night I didn't have my contacts in".  DAVID related that his contacts had been bothering him lately.  DAVID explained that he does not wear glasses in those instances and was not doing so during the course of the incident, despite being on duty.  DAVID recalled that approximately one year to a year and a half ago, he had been informed by an optometrist that he was "two letters away from being legally blind".  DAVID indicated that he could read a piece of paper situated on the table in the interview room in front of him but had trouble with distance vision and used license plates as an example.  DAVID indicated that his close range vision is fine.

DAVID recalled seeing NATHAN walking into AMY's office "out of the corner of my eye".  DAVID stated that he thought NATHAN had a question for AMY, however NATHAN entered the office and slammed the door.  DAVID recalled, "I stand up, I

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

back away". DAVID explained that NATHAN was "two inches from my face" and said "you were told not to touch anybody. Get your shit and get the fuck out". DAVID thought that NATHAN was joking at first but then he began to feel alarmed and threatened. DAVID recalled that NATHAN repeated himself, saying "I'm fucking serious, get you're shit and get the fuck out".

DAVID relayed that he and JAMES then left dispatch. DAVID acknowledged sending AMY a text saying "if I did or said something to offend you, I apologize". DAVID clarified during the interview that he was "just trying to apologize honestly for NATHAN getting in my face". DAVID recalled JAMES asking him what had happened as they traveled back to Olathe, after their abrupt departure from dispatch. DAVID recalled that he told JAMES that he had "leaned over" when they [DAVID and AMY] were talking about Spillman and "next thing I know NATHAN is in my face".

When asked about ▮▮▮▮ DAVID stated "GEORGETTE had talked to me about me grabbing her [▮▮▮▮ knee, you know just jokingly, she doesn't like it and we had a conversation about it". DAVID acknowledged that his training phase with ▮▮▮▮ ended early "because apparently it wasn't comfortable" and "for me doing that I guess". DAVID indicated that GEORGETTE wrote a Counseling Letter regarding "making ▮▮▮▮ feel uncomfortable". DAVID recalled apologizing to ▮▮▮▮ for his conduct. During the course of the interview, DAVID made the statement "other than ▮▮▮▮ that was the only time". When asked about ▮▮▮▮ DAVID indicated that he could not remember poking her in the chest but if he did so he would have been joking. When asked, DAVID did not think it would be appropriate to poke a woman in the chest as a joke. When asked about grabbing ▮▮▮▮ s sides, DAVID recalled grabbing her back and saying "boo" to scare her.

DAVID relayed that he was never asked about TIERRA by Olathe Police Department staff and not aware of any investigation by Olathe Police Department staff into any allegation regarding her. When TIERRA's name was mentioned, DAVID responded by saying, "are you going to tell me that TIERRA LEWIS is claiming that I sexually harassed her too?" When asked to describe his relationship with TIERRA, DAVID said that she is a "citizen of Olathe" and "nobody" to him. DAVID maintained, "I've only ever dealt with her professionally". DAVID recalled that TIERRA used to be friends with TARA WAGNER (DOB 05/02/1985), who had filed a complaint against him with ROGELIO. DAVID explained that TIERRA had been sending text messages at 11:30pm claiming to be him. DAVID recalled that he had gone to TIERRA's home in response but found that she was not at home. DAVID additionally recalled arresting TARA for an unrelated domestic violence incident.

On 04/20/2021, at approximately 0901 hours, I met with ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ within a recorded interview room within the Montrose Police Department. The associated recording has been uploaded to the case file for reference. The following is an administrative summary of our conversation which is not intended to be exhaustive.



▮▮▮▮ relayed that in "February or March of 2020", ▮▮▮▮ informed him that DAVID had "touched her upper thigh" and "she was very disturbed". ▮▮▮▮ relayed that DAVID's inappropriate behavior toward ▮▮▮▮ "started right away". ▮▮▮▮ recounted the obscene gesture made by DAVID in the McDonald's "drive through" and added that ▮▮▮▮ had recalled DAVID asking "does your husband like that?" ▮▮▮▮ further relayed ▮▮▮▮ had told him of DAVID's repeated touching of her leg. "She [▮▮▮▮ would tell me [▮▮▮▮ that she would push his hand away, tell him [DAVID] to stop and he would just laugh it off".

08/24/21

**EXHIBIT A**

**COPY**        <span style="color:red">**SEXUAL ASSAULT**</span>



████ further explained that "she was worried about going to her superiors about it because she was still on training". ████ recalled that ████ "went down on her day off to speak with sergeant". ████ relayed what he had learned of ████ conversation with GEORGETTE, stating "Sarge even said, she's like 'yeah he does that. He even does that with dispatchers in the S.O', which kinda frustrated me because like if you know he's doing it, you would think they would do something about it".

████ understood that GEORGETTE removed ████ from DAVID's training as a result of her disclosure, despite ████ being scheduled to work with DAVID the following weekend. ████ relayed that DAVID sent ████ a text message to the effect of "have a great weekend", which "made her feel really uncomfortable". ████ would later provide a screen shot of the text message referenced, which was uploaded to the case file. ████ had additionally relayed to ████ that DAVID confronted ████ regarding her disclosure at a later date, making a comment to the effect of "what you couldn't handle it with me?" ████ felt the "intimidation factor" was a dynamic that DAVID relied heavily upon.

After filing the complaint, ████ explained "we assumed it was handled, that it was done. We never heard anything more about it, so we just assumed it was handled". ████ expressed a sense of disappointment not only with DAVID's actions but in the way the Olathe Police Department responded to ████ outcry, "its frustrating having a female officer out there as your wife that you can't trust male officers with". "It's frustrating that it didn't get handled because then it happened to somebody else". "Luckily somebody else was strong enough to stand up and say 'you know what? I'm not going to put up with this".

On 04/20/2021, at approximately 1050 hours, I met with TARA WAGNER (DOB 05/02/1985) within a recorded interview room located at the Montrose Police Department. The associated recording has been uploaded to the case file for reference. The following is an administrative summary of our conversation which is not intended to be exhaustive.

TARA relayed that she "used to hang out" with TIERRA but explained that TIERRA is an alcoholic and they are no longer friends. TARA further relayed that TIERRA had been filing false police reports alleging that her [TARA's] husband was going to kill her [TARA], when he was not even at home. TARA recalled TIERRA harassing her via text message. TARA recalled that during a time period when she was in Louisiana, TIERRA was messaging a female party threatening to kill her and pretending to be TARA. TARA accordingly contacted the Olathe Police Department to report the incident and later learned that TIERRA was not contacted and no action was taken. TARA stated, "I knew as soon as I learned he [DAVID] was the one I was talking to that nothing was going to happen". TARA explained, "they [DAVID and TIERRA] had a sexual relationship". TARA recalled calling DAVID's "supervisor" to let them know what was going on between DAVID and TIERRA. TARA reflected, "it's bullshit that you [DAVID] take every single call that her [TIERRA's] name comes across on and nothing happens".

TARA recalled, "you know he got a hold of her [TIERRA] too, this is bullshit, he pulled us over one day. Literally, and he came to the window and he was like I just wanted your number to TIA [TIERRA]. Like that is what he did to get her fuckin number". TARA recalled that the traffic stop occurred in close proximity to the Camillo Court apartments. It is important to note that subsequent query of the Spillman Records system does not yield any documentation of such an event. TARA further recalled that she was not aware of any violations that

08/24/21

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

TIERRA had committed to prompt the traffic stop, further relaying that none were alleged by DAVID. TARA relayed that DAVID did not issue a summons to TIERRA as a result of the traffic stop.

TARA recalled a second incident during which DAVID arrested her at her home in July of 2020 for an alleged incidence of domestic violence. TARA relayed that DAVID appeared to have a trainee with him during the arrest. TARA recalled that during the course of the arrest DAVID's trainee appeared to begin to turn on his body worn camera, prompting DAVID to instruct him against its activation stating, "no, we don't need that". TARA remarked, "I don't like him [DAVID]. He is shady". TARA recalled being transported to Montrose Memorial Hospital for a medical clearance and while traveling to the hospital in custody in the back of DAVID's patrol vehicle, TARA recalled DAVID saying "you know, you could always join in and stuff". I asked TARA to clarify what she understood this comment to mean. TARA explained, "it was with him and TIA [TIERRA]"; "to have a threesome with those two". TARA relayed that she declined DAVID's offer, "I'm not one of those girls that was okay with go ahead and pull the car over and will just fix this and I made it clear". TARA added "he was a dick to me after that". TARA relayed that the charges against her were ultimately dropped as there was no evidence to substantiate differing versions of events in the case.

TARA recalled that DAVID "used to go to TIA's house all the time". TARA relayed that she and NICOLE SKOWRONEK (DOB 02/28/1984) were present at TIERRA's home when DAVID would "show up". TARA explained that TIERRA had an older male roommate and a child that were additionally present during DAVID's visits. TARA relayed that she and TIERRA would often drink alcohol quite a bit and DAVID would partake, consuming shots of alcohol. TARA explained that she was unsure if DAVID was on duty at the time she observed him consuming alcohol as he wore uniform for "roleplay" with TIARA, even when off duty and would "put her in handcuffs" and play "good cop bad cop". TARA additionally recalled an incident where DAVID was reportedly following her friend "TOM" in his patrol vehicle after "TOM" had been smoking marijuana at TIERRA's house. TARA explained that she called TIERRA and told her to "call her puppy home". TARA relayed that DAVID turned around following her phone call to TIERRA. TARA additionally suggested that I speak with NICOLE, as she [TARA] was aware that NICOLE had reportedly been touched inappropriately by DAVID.

On 04/22/2021, at approximately 1327 hours, I met with NICOLE SKOWRONEK (DOB 02/28/1984) within a recorded interview room located at the Montrose Police Department. The associated recording has been uploaded to the case file for reference. The following is an administrative summary of our conversation which is not intended to be exhaustive.

NICOLE recalled that she had been staying at TIERRA's house in a camper for a period of several days. NICOLE explained that she had a friend staying with her who got drunk with TIERRA and started causing problems by stealing TIERRA's television and a toy box from her home. NICOLE recalled that DAVID kept calling her phone in response to the discord. NICOLE called the Olathe Police Department in response and learned that TIERRA had called DAVID directly on his personal cell phone. NICOLE remarked that TIERRA would call DAVID's cell phone and "he would run". NICOLE added "she [TIERRA] bragged about it. She was so proud because she could do anything because she was fucking a cop". NICOLE reflected, "this woman, like I don't know how she even still has her children. She drives around drunk all the time with her kids in the car. She had pedophiles trying to go pick them up from daycare because she too drunk to get her own kids from school. Nobody ever did anything or said anything to her and

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

I think that has a lot to do with it".  NICOLE explained that she only stayed at TIERRA's for a period of approximately two days and during that period DAVID was at TIERRA's home several times.  NICOLE stated "he [DAVID] showed up before and I had to leave so she could have her personal time with him".  NICOLE recalled being instructed by TIERRA to take her car out for a drive for added privacy and not just go out to her camper during at least one of DAVID's visits.  NICOLE relayed that she was aware that TIERRA was mad at DAVID at one point for "sleeping with other women in town".

NICOLE recalled an incident during an appearance in Olathe Municipal Court before JUDGE BROWN regarding a dog at large summons.  NICOLE explained that JUDGE BROWN made her friend, EARL CHAMPLIN (DOB 12/18/1969), leave the courtroom, reportedly after becoming aware that EARL was recording court proceedings on his phone.  NICOLE explained that as EARL departed the courtroom, he left his phone on her lap.  NICOLE relayed that DAVID subsequently approached her and without direction from JUDGE BROWN began to "intimidate" her into relinquishing EARL's phone.

NICOLE recalled that DAVID attempted to grab the cell phone from her lap twice.  NICOLE recalled that he first time DAVID touched her leg and the second time she put her hand down and stated "you just grabbed my crotch".  NICOLE explained "the second time he did actually touch my private parts".  NICOLE recalled stating, "you need to quit grabbing at my crotch, that's unacceptable".  NICOLE added, "I yelled at him that he sexually assaulted me.  I told the Judge that its bullshit that he does nothing about that".  NICOLE explained that she believed the recording on EARL's phone had "timed out" and she had never watched the recording.  NICOLE added that EARL had several cell phones since the one involved in this incident.  NICOLE added that there were no additional witnesses to the incident, "I got the maximum penalty for a dog at large ticket because I caused a scene and disrupted court proceedings but I was the last person in there, just the cop and the judge".

NICOLE recalled that the incident made her feel "totally uncomfortable", "intimidated" and "helpless".  NICOLE explained, "I think he [DAVID] is completely unprofessional.  I don't feel like he does his job.  I feel like he just wants to be a cop so he has power".  NICOLE added, "He [DAVID] like just felt like he could do whatever he wanted.  I don't feel like he followed procedures.  I have never experienced a police officer like that.  I don't feel like he followed the law.  I don't feel like he followed procedures.  I feel like he just did what he wanted because he had a badge".

NICOLE suggested I speak with STEFFANIE "STEEVIE" TURNER (DOB 03/03/1987), who owned "Hottie Coffee" located in Olathe.  NICOLE recalled being in the rear of the business doing dishes when she reportedly heard DAVID making a statement to the effect of "come on just give me thirty minutes".  NICOLE relayed that STEEVIE "turned him [DAVID] down over and over again".  NICOLE felt that STEEVIE's rejection of DAVID let to him filing charges against her for prostitution.

On 04/29/2021, at approximately 1324 hours, I met with STEFFANIE "STEEVIE" TURNER (DOB 03/03/1987) within a recorded interview room located at the Montrose Police Department.  The associated recording has been uploaded to the case file for reference.  The following is an administrative summary which is not intended to be exhaustive.

STEEVIE stated that DAVID "always gave me the creeps, right off the bat" and described him as a "weird guy".  STEEVIE explained "he would hang out at my

08/24/21

**EXHIBIT A**

<span style="color:red">**COPY**</span>          <span style="color:red">**SEXUAL ASSAULT**</span>

coffee shop and I don't remember him ever ordering anything to drink or pastry or whatever. He'd hang out there quite a bit". STEEVIE stated that DAVID "propositioned me several times". STEEVIE recalled an instance where she recalled asking "if I would do something for him he would look the other way, when there was nothing going on to look away from". STEEVIE stated that she was unaware that DAVID was investigating an allegation of prostitution involving her at the time. STEEVIE recalled that she later became aware of the investigation and it "got personal". She recalled DAVID making a statement to the effect of "who is going to believe you over me?"

STEEVIE additionally recalled an incident during which DAVID assisted her during a civil standby to retrieve property belonging to her father. During the course of the standby, STEEVIE recalled that DAVID's wife called him and she saw a picture of his wife displayed on his phone. STEEVIE recalled remarking "oh, she's pretty" and DAVID responding, "that's not something you get to see yet". I asked STEEVIE to help me understand what she took that comment to mean and she relayed that she felt DAVID was "hinting at a threesome".

STEEVIE recalled being "out back" of her business, fixing a privacy fence, when she was approached by CHIEF PACHECO. STEEVIE relayed that ROGELIO made a comment to the effect of, "I told them that there was no way that you could be doing that. And he told me 'so if you do that again, be quiet about it'". STEEVIE added that ROGELIO stated, "I should find my old Chief a side project". STEEVIE explained "that's when the news and all that stuff had already come out, so I knew exactly what PACHECO was talking about, what he was alluding to or whatever".

On 05/04/2021, at approximately 1740 hours, DETECTIVE SERGEANT BERRY and I met with GEORGETTE BLACK (DOB 12/07/1972) within a recorded interview room located at the Montrose Police Department. The associated recording has been uploaded to the case file for reference. The following is an administrative summary of the conversation which is not intended to be exhaustive.

GEORGETTE relayed that she had been unable to locate the Counseling Letter she had written to DAVID regarding ▮▮▮▮ "I have no idea where it got put, where it got saved to, what happened with it, I don't know". GEORGETTE explained that she told DAVID that she planned to write a Counseling Letter "because there has been concern before with what's going on. You've been told just don't touch anybody, I don't care if it's on their arm, just don't touch anybody period". GEORGETTE further explained that she typed out a letter and told him he would receive a letter but never actually gave it to DAVID. GEORGETTE explained, "when I talked to him, I said ▮▮▮▮ has come forward saying she was uncomfortable when she was with you. That you touched her arm a couple different times. She did not feel comfortable with it. I'm like, you know we've already talked about this with dispatch didn't feel comfortable with you being in there and they felt you were being too handsey or too touchy there as well. I said, we've talked about this before. If you don't, don't touch people unless you know it's okay to touch them period. And I said 'I'm going to be doing a Counseling Letter on this because we've talked with you before, now we need to talk to you again, because its been brought up again, we're to the next step and if we half to talk to you again its probably going to be a write up, at least a write up at the very least". GEORGETTE further explained that it is the policy of the Olathe Police Department that two Letters of Reprimand result in the termination of an employee. GEORGETTE added that the letter she drafted regarding ▮▮▮▮ would have been Letter of Counseling and not a Letter of Reprimand.

**EXHIBIT A**

**COPY**                    **SEXUAL ASSAULT**

GEORGETTE provided additional information regarding her memory of ▇▇▇ disclosure. "She said that when they were driving around sometimes she felt uncomfortable. That he had touched her arm a few times like when they were riding around and stuff and she touched her arm where she didn't feel comfortable and just didn't feel like he was being appropriate when he touched her. That's what she told me". GEORGETTE clarified, "she told me he touched her on her arm and I don't even recall her saying that he touched her on the leg"; "she told me that she had been touched, that he had touched her on the arms a couple different times. I don't recall her telling me that he had touched her on the leg. I don't recall that at all. She might have but I don't recall it at all". GEORGETTE added, "I remember our conversation about it, she was very upset". GEORGETTE additionally recalled informing ▇▇▇ "I told her [▇▇▇▇ I said I'm going to be talking with him and we will go from there". GEORGETTE recalled subsequently speaking with DAVID regarding ▇▇▇ disclosure; "OFFICER ▇▇▇▇ came and spoke with me. She felt uncomfortable when she has been in training with you. That you touched her where she did not feel comfortable and that this had happened on more than once occasion and that it needed to cease". DETECTIVE SERGEANT BERRY and I confronted GEORGETTE regarding ▇▇▇ and DAVID agreeing that the issue was over touching to a disputed part of the leg and did not reference any touching of ▇▇▇ arm. GEORGETTE replied, "really, because that is what I remember when they told me and that's what they talked to me about".

GEORGETTE provided a copy of the Letter of Counseling she issued to DAVID regarding reports, which has been added to the case file for reference. GEORGETTE explained that Letters of Counseling are commonly saved to work desktop computer. GEORGETTE recalled drafting the Letter of Counseling regarding ▇▇▇ in March of 2020 on her current work desktop computer. On the evening of 05/04/2021, DETECTIVE MARANTO, OFFICER NARO and I traveled to the Olathe Police Department, where with GEORGETTE's consent, the hard drive from her work desktop computer was forensically cloned to ensure continued operational functionality while facilitating its subsequent digital forensic analysis by OFFICER NARO. OFFICER NARO would later advise that the Letter of Counseling regarding ▇▇▇ was not present on the hard drive examined, even amongst deleted Microsoft Word files.

On 05/13/2021, at approximately 1429 hours, DETECTIVE SERGEANT BERRY and I met with ROGELIO PACHECO (DOB 09/16/1961) within a recorded interview room located at the Montrose Police Department. The associated recording has been uploaded to the case file for reference. The following is an administrative summary of our conversation and is not intended to be exhaustive.

ROGELIO relayed that he had offered DAVID the opportunity to resign in conversations with his attorney. ROGELIO reiterated his knowledge of an allegation of a sexual relationship between DAVID and TIERRA which he relayed came through "TIERRA's sister". ROGELIO explained that he asked GEORGETTE to look into the allegation. ROGELIO believed that GEORGETTE had talked to TIERRA regarding the allegations and she had denied it. ROGELIO relayed that he had not conducted any aspect of the investigation himself and had not followed up with GEORGETTE about it. ROGELIO did recall speaking with the Olathe Town Manager regarding the allegation. ROGELIO relayed that nothing had been documented in written form regarding any investigation into the matter. ROGELIO did recall speaking with DAVID regarding the allegations involving TIERRA. "I told him this is what I heard, I don't know if it's true or not. You better cool it. I told him whatever you do off duty is your business but it if you do it on duty, if I find out that this is happening on duty, we are going to fix

**EXHIBIT A**

**COPY**          **SEXUAL ASSAULT**

it".

ROGELIO indicated that he was aware of one Letter of Counseling issued to DAVID regarding report writing and unaware of any Letter of Counseling regarding ███████ disclosure.  ROGELIO relayed that his level of knowledge about █████ was limited to "rumors".  ROGELIO was asked to explain and he stated, "I didn't know this, but one time I talked to [GEORGETTE] BLACK and she said that when he was FTOing with █████ at one point, he touched her hand or grabbed her hand or something and she felt really uncomfortable and reported it to BLACK.  And I believe BLACK talked to him about it".  ROGELIO recalled informing GEORGETTE, "I go GEORGETTE talk to him.  I didn't know about it until █████ was gone".  ROGELIO was unaware that █████ training with DAVID had been cut short as a result of her disclosure.  ROGELIO expressed a sense of frustration with GEORGETTE, stating "how come I didn't know this, how come you never told me?" "At this point I'm pissed off at her too because this is something that you can't just let go.  If it's that that important when █████ talked to her, the procedure is that you write a letter, the counseling letter and bring it in, you bring it to the Chief and sit down let's talk about it.  Okay what happened? Nothing".  ROGELIO added, "I'm glad you talked to █████ because I didn't know about it, otherwise I would have taken care of it".  ROGELIO added that DAVID's wife had called him at one point during the tenure of his employment and he had attempted to return the call several times but his calls had gone unanswered.

On 05/13/2021, at approximately 1602 hours, I met with NORA HAMMER (DOB 09/11/1980) within a recorded interview room located at the Montrose Police Department.  The associated recording has been uploaded to the case file for reference.  The following is an administrative summary of our conversation and is not intended to be exhaustive.

NORA relayed that she had been with DAVID for approximately ten years, married nine and had been divorced for approximately five to six years.  NORA explained that she and DAVID share a daughter and a son together.  NORA explained that DAVID worked in the prison system in New Mexico before relocating to Colorado. Once in Colorado, that DAVID worked at Ridgway State Park, Community Corrections in Montrose, the San Miguel County Sheriff's Office and the Olathe Police Department.

NORA recalled that while an employee at the Ridgway State Park, DAVID was "written up for discharging his firearm in our household (748 Cedar Creek Avenue, "Sunshine Peak Apartments", Apartment A103, Montrose).  He cleared his weapon and shot through my bed, on the side where I would be sleeping".  NORA recalled that she was present in living room watching a movie with daughter and her son was asleep in a separate bed.  NORA remarked that DAVID seemed to be in a different mind frame at the time of the incident and was possibly suicidal. NORA relayed that DAVID normally cleared weapon outside.  NORA believed that the incident had been reported to Ridgway State Park staff to account for the expended round but not the Montrose Police Department.  NORA added, "I was also told that he tried to take the paperwork out of his file".  NORA further recalled "he was actually seeing one of the young ladies up there while we were married and she was like eighteen or nineteen-ish, running the education program and so they had a lot of issues trying to find him when he was on duty and he was actually circumventing with her".  NORA indicated that DAVID was fired from Community Corrections for what she believed to be "inappropriate contact with a co-worker".  Community Corrections staff indicated that DAVID was an employee for a matter of ten days in November, 2014 before being terminated for making female staff feel uncomfortable.  NORA recalled that while DAVID was employed at

08/24/21

**EXHIBIT A**

**COPY**                    **SEXUAL ASSAULT**

the San Miguel County Sheriff's Office, "he was involved with a few women" who were co-workers.  NORA added, "I got wind of possible inappropriate contact with an inmate".  According to NORA, DAVID was placed on leave without pay while an investigation was conducted.  NORA stated, "he told me he didn't do anything wrong so he resigned before they could terminate him".

NORA replied "well, this isn't the first time, so.  Yeah this has happened repeatedly at a few other jobs" and "it was a matter of time before it happened again".  NORA remarked "he totally makes it seem like he did nothing wrong.  Like he was joking around".  NORA explained that she had spoken to DAVID regarding the investigation and he had indicated he had no idea what the investigation was about.  NORA relayed, "my mom and dad were like 'you know NORA' and I was like 'a Tiger never changes its stripes".  NORA reflected, "this is starting to become a little bit of a habit".  NORA stated, "there is no integrity behind the badge".  "I do know that for him, he thinks also that having a badge, he doesn't have to abide by a lot of rules".  "I don't know how he got hired and hired again, honestly.  I was like is anybody doing their homework and actually investigating what kind of person he is with his integrity and stuff?"  "He's out of a job, he just knows.  He's going to do HVAC heating and cooling.  He's like, I guess I'm getting out of law enforcement".

On 06/03/2021, I served DAVID with a summons (A149951), within a recorded interview room located at the Montrose Police Department, charging him with the following offenses;

AMY
Unlawful sexual contact 18-3-404(1)(a) [1M]

███████
Criminal attempt 18-2-101(1)
Unlawful sexual contact 18-3-404(1)(a) [2M]

███████
Harassment 18-9-111(1)(a) [3M]

███████
Harassment 18-9-111(1)(a) [3M]

On 06/03/2021, I was advised that DAVID's employment with the Olathe Police Department had been terminated.


EVIDENCE.COM VIDEO:  Y
EVIDENCE.COM PHOTOS:  Y

CASE STATUS: Cleared by Arrest

/s/ Det. Patrick Demers 139945


Responsible LEO:

08/24/21

**EXHIBIT A**

**COPY**        **SEXUAL ASSAULT**

_____

**Approved by:**

_____

**Date**

08/24/21

**EXHIBIT A**